UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

Tang Capital Partners, LP,                    :

          Plaintiff,                    :     INDEX NO.

    vs.                                       :     COMPLAINT

Cell Therapeutics, Inc.,                      :     (JURY TRIAL DEMANDED)

          Defendant.                    :

------------------------------------ X

     Plaintiff Tang Capital Partners, LP ("Tang Capital"), by and through its attorneys, complains against Defendant Cell Therapeutics, Inc. ("CTI") as follows:

PARTIES

    1.     Plaintiff Tang Capital is, and was at all times relevant to this Complaint, a privately held limited partnership organized under the laws of the State of Delaware, with its principal place of business in San Diego, California.

    2.     Tang Capital is informed and believes, and based thereon alleges, that CTI is, and was at all times relevant to this Complaint, a publicly held corporation organized under the laws of the State of Washington, with its principal place of business in Seattle, Washington.

JURISDICTION AND VENUE

    3.     This Court has jurisdiction over the subject matter of the claims for relief asserted herein pursuant to 28 U.S.C. § 1332(a)(2) because there is complete diversity of citizenship and the value of the matter in controversy exceeds $75,000, exclusive of interest and costs.

    4.     Further, venue is proper in this judicial district because both parties consented and agreed to submit to the exclusive jurisdiction of the state and federal courts sitting in the City of

New York, borough of Manhattan, for disputes arising from or in any way relating to the Securities Purchase Agreement between Tang Capital and CTI.

## STATEMENT OF FACTS

5.    Prior to and culminating on or about April 16, 2007, Tang Capital and CTI negotiated and entered into a Securities Purchase Agreement ("Purchase Agreement"), a true and correct copy of which is attached hereto as Exhibit 1 and incorporated by reference as though set forth in full herein.  Under the terms of the Purchase Agreement, Tang Capital agreed, *inter alia*, to purchase 3,000 shares of Cell Therapeutics' Series B 3% Convertible Preferred Stock ("Series B Preferred Stock"), then valued at $3,000,000.00.  *See* Exh. 1, Article II, Section 2.1.

6.    In defining "Preferred Stock" in the Purchase Agreement, CTI agreed, *inter alia*, to provide Tang Capital, and all other purchasers of the Series B Preferred Stock, with certain voting rights, preferences, and covenants as holders of the Series B Preferred Stock:

> "Preferred Stock" means up to 37,200 shares of the Company's Series B 3% Convertible Preferred Stock issued hereunder having the rights, preferences and privileges set forth in the Certificate of Designation, in the form of Exhibit A hereto.

Exh. 1, Article I, Section 1.1

7.    These rights, preferences, and covenants granted to holders of the Series B Preferred Stock were set forth in CTI's Certificate of Designation ("Articles"), which was attached as Exhibit A to the Purchase Agreement.  The Articles are attached hereto as Exhibit 2 and incorporated by reference as though set forth in full herein.  By way of the Articles, CTI expressly agreed not to:  (1) amend the Articles; or (2) repay, repurchase, acquire, or offer to repay, repurchase or acquire any common stock or "Common Stock Equivalents" without written consent by holders of at least 67% of the Series B Preferred Stock.  Specifically, Article II (2)(b), Section 10 of the Articles states:

Negative Covenants. So long as any shares of Series B Preferred Stock are outstanding, unless the holders of at least 67% in Stated Value of the then outstanding shares of Series B Preferred Stock shall have otherwise given their prior written consent, the Corporation shall not, and shall not permit any of its subsidiaries (whether or not a Subsidiary on the Original Issue Date) to, directly or indirectly:

a) amend these articles of incorporation, its bylaws or other charter documents so as to materially and adversely affect any rights of any Holder

b) repay, repurchase or offer to repay, repurchase or otherwise acquire any shares of its Common Stock, Common Stock Equivalents or Junior Securities . . . .

("Negative Covenant") Exh. 2.

8.      Article I, Section 1.1 of the Purchase Agreement defines "Common Stock Equivalents" as follows:

"Common Stock Equivalents" means any securities of the Corporation or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, *any debt,* preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock. (Emphasis added).

Exh. 1, Article I, Section 1.1.

9.      The foregoing Negative Covenant was a material provision of the Purchase Agreement and the Articles (collectively "Transaction Documents") since it limited CTI's ability to misuse or waste its assets, commit its scarce resources to pay off certain stakeholders ahead of holders of the Series B Preferred Stock, alter the relative size and priority of the stakeholders in CTI's capital structure, or otherwise take actions that could cause unexpected changes to CTI's financial position without first obtaining written consent from its preferred investors. Without the Negative Covenant, Tang Capital would risk exposure to future adverse changes within the

company that were not bargained for when Tang Capital and CTI negotiated the Purchase Agreement.

10.     Before executing the Purchase Agreement, Tang Capital reviewed the terms, definitions, covenants and warranties in the Transaction Documents and believed that they accurately reflected the parties' binding agreement.  CTI represented as much – Article III, Section 3.1(c) of the Purchase Agreement states:

> "Each Transaction Document has been (or upon delivery will have been) duly executed by the Company and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms."

Exh. 1, Article III, Section 3.1(c).

11.     On or around November 26, 2007, CTI sent all holders of the Series B Preferred Stock an Action by Written Consent ("Requested Consent"), attached hereto as Exhibit 3 and incorporated by reference as though set forth in full herein, seeking approval to cancel, exchange, acquire or otherwise restructure any outstanding convertible debt without further written consent from the Series B Preferred Stock holders.  CTI admitted that the convertible notes and other CTI debt securities at issue in the Requested Consent constituted Common Stock Equivalents. *See* Exh. 3.

12.     Since the Requested Consent would significantly limit Tang Capital's rights under the Transaction Documents and, in particular, the Negative Covenant, Tang Capital did not give its written consent to CTI's Requested Consent.

13.     Tang Capital is informed and believes, and based thereon alleges, that the Requested Consent was never approved by holders of at least 67% of the Series B Preferred Stock.

14.    Notwithstanding the Transaction Documents, and in direct violation thereof, CTI, on or around December 11, 2007, filed Articles of Correction to the Articles of Amendment to Amended and Restated Articles of Incorporation of CTI ("Articles of Correction"), attached hereto as Exhibit 4 and incorporated by reference as though set forth in full herein.  Tang Capital is informed and believes, and based thereon alleges, that the Articles of Correction were filed without obtaining written consent from holders of at least 67% of the Series B Preferred Stock. The Articles of Correction materially and adversely altered the definition of Common Stock Equivalents as set forth in the Articles, changing the definition to the following:

> "Common Stock Equivalents" means any securities of the Corporation or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock; ***provided, however, that Common Stock Equivalents shall not include any debt securities of the Corporation***." (emphasis added).

Exh. 4.

15.    The Articles of Correction materially and adversely altered the "valid and binding" Purchase Agreement, since the definition of "Common Stock Equivalents" now excludes any CTI convertible debt securities, in contrast to its definition in the Articles, which explicitly included such convertible debt securities.  This significantly limits the voting power of Tang Capital and all Series B Preferred Stock holders as set forth in the Negative Covenant by denying them their important right to veto certain CTI transactions they deem are not in the best interests of CTI and its shareholders.  This change was not bargained for when Tang Capital executed the Purchase Agreement on April 16, 2007 and directly conflicts with Article II 2(b), Section 4(b) of the Articles, which provides, in relevant part:

> Notwithstanding anything to the contrary in Section 4(a) above, as long as any shares of Series B Preferred Stock are outstanding, the Corporation shall not, without the affirmative vote of the Holders of a majority of the then outstanding shares of the Series B Preferred Stock, (a) alter or change adversely the powers, preferences or rights given to the Series B Preferred Stock or alter or amend this Article II.2(b) . . . (c) amend its articles of incorporation or other charter documents in any manner that adversely affects any rights of the Holders . . . or (e) enter into any agreement with respect to any of the foregoing.

Exh. 2, Article II 2(b), Section 4(b).

16.    Immediately following its unauthorized decision to alter the terms of the Articles, CTI, on or around December 12, 2007, repurchased and acquired convertible debt securities that were convertible into approximately 450,734 shares of common stock. CTI financed this repurchase and acquisition with new convertible debt securities and common stock that, combined, are convertible into or represent approximately 13,209,574 shares of common stock. This represents a 2,830% increase in the number of common shares underlying the securities subject to the December 12, 2007 transactions ("Convertible Transactions"). Specifically, in the Convertible Transactions, $36.1 million of existing 5.75% Convertible Subordinated Notes and Convertible Senior Subordinated Notes due June 15, 2008 were repurchased and acquired for 5,459,574 shares of CTI common stock and new Convertible Senior Notes due December 15, 2011, with a face amount of $23.25 million, that are convertible into 7,750,000 shares of CTI common stock. CTI did not send another Action by Written Consent to holders of the Series B Preferred Stock requesting their consent before entering into the foregoing dilutive Convertible Transactions.

17.    On or around December 13, 2007, CTI filed a Form 8-K with the Securities and Exchange Commission ("SEC") announcing the Convertible Transactions. A copy of the Form 8-K is attached hereto as Exhibit 5 and incorporated by reference as though set forth in full

herein. A press release attached to the Form 8-K acknowledged that certain Series B Preferred Stock holders, including Tang Capital, have asserted a right to consent or object to the Convertible Transactions. *See* Exh. 5.

18.    Any doubt about the materiality of the change in the Articles of Correction, or of the adverse impact to Tang Capital and all other holders of Series B Preferred Stock, is removed by examining the market's reaction to CTI's announcement of the Convertible Transactions. On December 13, 2007, the day the transaction was publicly announced, CTI's stock price fell 20%. This market reaction demonstrates the broad consensus that CTI shareholders did not believe the Convertible Transactions were in their best interests – precisely the situation the Negative Covenant was designed to prevent by requiring written consent from holders of the Series B Preferred Stock before such a transaction could occur.

19.    Further, the Articles expressly provide that a "Triggering Event" occurs where CTI "fails to observe or perform any other covenant, agreement or warranty" or commits any breach of the Transaction Documents. Exh. 2, Article II (2)(b), Section 9. Upon a "Triggering Event," all holders of the Series B Preferred Stock are entitled to a cash payment equal to the following amount:

> "Triggering Redemption Amount" means, for each share of Series B Preferred Stock, the sum of (i) the greater of (A) 130% of the Stated Value and (B) the product of (a) the VWAP on the Trading Day immediately preceding the date of the Triggering Event and (b) the Stated Value divided by the then Conversion Price, (ii) all accrued but unpaid dividends thereon and (iii) all liquidated damages and other costs, expenses or amounts due in respect of the Series B Preferred Stock.

Exh. 2, Article II (2)(b), Section 1.

### DEMAND FOR COMPLIANCE

20.    On or about December 11, 2007, Tang Capital sent a letter to CTI demanding compliance with the Transaction Documents and the Negative Covenant contained therein. *See* Exh. 5.

21.    CTI has failed and refused to comply with the terms and conditions of the Transaction Documents.

### FIRST CAUSE OF ACTION

### (Breach of Contract)

22.    Tang Capital realleges and incorporates Paragraphs 1 through 21, inclusive, of this Complaint as though fully set forth herein.

23.    As alleged hereinabove, Tang Capital entered into the Purchase Agreement with CTI to purchase its Series B Preferred Stock, which was clearly defined in the Purchase Agreement and that carried with it specified rights, privileges and preferences set forth in the Articles. At all relevant times, Tang Capital performed its obligations under the Transaction Documents.

24.    Pursuant to the Transaction Documents and the Negative Covenant contained therein, CTI was required to obtain written consent from at least 67% of the Series B Preferred Stock holders before either: (1) amending the Articles; or (2) repaying, repurchasing, acquiring, or offering to repay, repurchase, or acquire any CTI security which could be converted into common stock, including convertible notes and other debts.

25.    As alleged hereinabove, CTI breached the Purchase Agreement with Tang Capital by materially and adversely altering the terms of the Transaction Documents that were represented to be "valid and binding" by CTI upon their execution on April 16, 2007.

26.    As alleged hereinabove, CTI further breached the Purchase Agreement with Tang Capital by filing the Articles of Correction.

27.    In addition, CTI further breached the Purchase Agreement with Tang Capital by consummating the Convertible Transactions without obtaining prior written consent from holders of at least 67% of the Series B Preferred Stock.

28.    As a result, Tang Capital has been damaged.

**WHEREFORE**, Tang Capital prays for relief as follows:

(a)    For judgment to be entered in favor of Tang Capital and against CTI;

(b)    For damages according to proof including, but not limited to, the Triggering Redemption Amount as defined in Article II (2)(b), Section 9 of the Articles;

(c)    For prejudgment interest on such damages as provided by law;

(d)    For costs of suit, attorneys' fees and interest, as provided by statute, by the terms of the Purchase Agreement, or otherwise;

(e)    For such other and further relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Dated: January 2, 2008

Respectfully submitted,
COOLEY GODWARD KRONISH LLP

By: _____
Shannon McKinnon

Celia Goldwag Barenholtz (CB 9126)
Shannon McKinnon (SM 9377)
The Grace Building
1114 Avenue of the Americas
New York, NY 10036
(212) 479-6000

Philip C. Tencer (Cal. State Bar # 173818)
Ryan E. Blair (Cal. State Bar # 246724)
4401 Eastgate Mall
San Diego, CA 92101
(858) 550-6000

*Attorneys for Plaintiff*
*Tang Capital Partners, LP*

Exh. 1

## SECURITIES PURCHASE AGREEMENT

This Securities Purchase Agreement (this "Agreement") is dated as of April 11, 2007, among Cell Therapeutics, Inc., a Washington corporation (the "Company"), and each purchaser identified on the signature pages hereto (each, including its successors and assigns, a "Purchaser" and collectively the "Purchasers").

WHEREAS, subject to the terms and conditions set forth in this Agreement and pursuant to an effective registration statement under the Securities Act, the Company desires to issue and sell to each Purchaser, and each Purchaser, severally and not jointly, desires to purchase from the Company, securities of the Company as more fully described in this Agreement.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the Company and each Purchaser agree as follows:

## ARTICLE I.
## DEFINITIONS

1.1     Definitions.  In addition to the terms defined elsewhere in this Agreement, (a) capitalized terms that are not otherwise defined herein have the meanings given to such terms in the Certificate of Designation (as defined herein) and (b) the following terms have the meanings set forth in this Section 1.1:

"Action" shall have the meaning ascribed to such term in Section 3.1(j).

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person as such terms are used in and construed under Rule 144 under the Securities Act.  With respect to a Purchaser, any investment fund or managed account that is managed on a discretionary basis by the same investment manager as such Purchaser will be deemed to be an Affiliate of such Purchaser.

"Business Day" means any day except Saturday, Sunday, any day which shall be a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Certificate of Designation" means the Articles of Amendment to the Company's Amended and Restated Articles of Incorporation filed by the Company with the Secretary of State of the State of Washington on or before April 16, 2007, in the form of Exhibit A attached hereto.

"Closing" means the closing of the purchase and sale of the Securities pursuant to Section 2.1.

"Closing Date" means April 16, 2007, provided that all conditions precedent to (i) the Purchasers' obligations to pay the Subscription Amount and (ii) the Company's

1

obligations to deliver the Preferred Stock and Warrants have been satisfied or waived on or before such date.

"Commission" means the Securities and Exchange Commission.

"Common Stock" means the common stock of the Company, no par value per share, and any other class of securities into which such securities may hereafter be reclassified or changed into.

"Common Stock Equivalents" means any securities of the Company or the Subsidiaries which would entitle the holder thereof, pursuant to the terms of such securities, to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

"Company Counsel" means Heller Ehrman LLP with offices located at 333 Bush Street, San Francisco, California 94104.

"Conversion Price" shall have the meaning ascribed to such term in the Certificate of Designation.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"FWS" means Feldman Weinstein & Smith LLP with offices located at 420 Lexington Avenue, Suite 2620, New York, New York 10170-0002.

"GAAP" shall have the meaning ascribed to such term in Section 3.1(h).

"Indebtedness" means (a) any liabilities for borrowed money or amounts owed in excess of $250,000 (other than trade accounts payable incurred in the ordinary course of business), (b) all guaranties, endorsements and other contingent obligations in respect of Indebtedness of others, whether or not the same are or should be reflected in the Company's balance sheet (or the notes thereto), except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and (c) the present value of any lease payments in excess of $250,000 due under leases required to be capitalized in accordance with GAAP.

"Intellectual Property Rights" shall have the meaning ascribed to such term in Section 3.1(o).

"Liens" means a lien, charge, security interest, encumbrance, right of first refusal, preemptive right or other restriction.

"Material Adverse Effect" shall have the meaning assigned to such term in Section 3.1(b).

2

"Material Permits" shall have the meaning ascribed to such term in Section 3.1(l).

"Per Share Purchase Price" equals $1,000, subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the date of this Agreement.

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"Preferred Stock" means up to 37,200 shares of the Company's Series B 3% Convertible Preferred Stock issued hereunder having the rights, preferences and privileges set forth in the Certificate of Designation, in the form of Exhibit A hereto.

"Proceeding" means an action, claim, suit, investigation or proceeding.

"Prospectus" means the final prospectus filed for the Registration Statement.

"Prospectus Supplement" means the supplement to the Prospectus complying with Rule 424(b) of the Securities Act that is filed with the Commission and delivered by the Company to each Purchaser at the Closing.

"Purchaser Party" shall have the meaning ascribed to such term in Section 4.5.

"Registration Statement" means the effective registration statement with Commission file No. 333-131533 which registers the sale of the Preferred Stock, the Underlying Shares, the Warrants and the Warrant Shares by the Purchasers.

"Required Approvals" shall have the meaning ascribed to such term in Section 3.1(e).

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"SEC Reports" shall have the meaning ascribed to such term in Section 3.1(h).

"Securities" means the Preferred Stock, the Underlying Shares, the Warrants and the Warrant Shares.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Short Sales" shall include all "short sales" as defined in Rule 200 of Regulation SHO under the Exchange Act (but shall be deemed to not include the location and/or reservation of borrowable shares of Common Stock).

"Subscription Amount" means, as to each Purchaser, the aggregate amount to be paid for the Preferred Stock purchased hereunder as specified below such Purchaser's name on the signature page of this Agreement and next to the heading "Subscription Amount," in United States dollars and in immediately available funds.

"Stated Value" means $1,000 per share of Preferred Stock, subject to increase as set forth in Section 3(a) of the Certificate of Designation.

"Trading Day" means a day on which the Common Stock is traded on a Trading Market.

"Trading Market" means the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the American Stock Exchange, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market or the New York Stock Exchange.

"Transaction Documents" means this Agreement, the Certificate of Designation, the Warrants and any other documents or agreements executed in connection with the transactions contemplated hereunder.

"Underlying Shares" means the shares of Common Stock issued and issuable upon conversion of the Preferred Stock in accordance with the terms of the Certificate of Designation.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Purchasers at the Closing in accordance with Section 2.2(a) hereof, which Warrants shall be exercisable starting six months after the Closing Date and have a term of exercise equal to 2 years, in the form of Exhibit C attached hereto.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

## ARTICLE II.
## PURCHASE AND SALE

2.1     Closing.  On the Closing Date, upon the terms and subject to the conditions set forth herein, the Company agrees to sell, and each Purchaser agrees to purchase in the aggregate, severally and not jointly, up to $37,200,000 of Preferred Stock with an aggregate Stated Value equal to such Purchaser's Subscription Amount and Warrants as determined pursuant to Section 2.2(a) at the Per Share Purchase Price.  The aggregate number of shares of Preferred Stock sold hereunder shall be up to 37,200.  Each Purchaser shall deliver to the Company via wire transfer or certified check immediately available funds equal to its Subscription Amount and the Company shall deliver to each Purchaser its respective shares of Preferred Stock and Warrants as determined pursuant to Section 2.2(a) and the other items set forth in Section 2.2 issuable at the Closing.  Upon satisfaction of the conditions set forth in Sections 2.2 and 2.3, the Closing shall occur at the offices of FWS or such other location as the parties shall mutually agree.

2.2     Deliveries.

4

(a) On or prior to the Closing Date, the Company shall deliver or cause to be delivered to each Purchaser the following:

(i)    this Agreement duly executed by the Company;

(ii)    a legal opinion of Company Counsel, substantially in the form of Exhibit B attached hereto;

(iii)    a number of shares of Preferred Stock equal to such Purchaser's Subscription Amount divided by the Stated Value, registered in the name of such Purchaser;

(iv)    a Warrant registered in the name of such Purchaser to purchase up to a number of shares of Common Stock equal to 50% of such Purchaser's Subscription Amount divided by $6.73,[1] with an exercise price equal to $6.48[2] subject to adjustment therein (such Warrant may be delivered within three Business Days of the Closing Date), in the form of Exhibit C attached hereto; and

(v)    the Prospectus and Prospectus Supplement (unless the conditions set forth under Rule 172 under the Securities Act have been satisfied).

(b) On or prior to 4:00 p.m. Eastern Time on the date hereof, each Purchaser shall deliver or cause to be delivered to the Company this Agreement duly executed by such Purchaser; and on or before the Closing Date, such Purchaser's Subscription Amount by wire transfer to the account as specified in writing by the Company.

2.3    Closing Conditions.

(a)    The obligations of the Company hereunder in connection with the Closing as to any Purchaser are subject to the following conditions being met:

(i)    the accuracy in all material respects when made and on the Closing Date of the representations and warranties of such Purchaser contained herein;

(ii)    all obligations, covenants and agreements of such Purchaser required to be performed at or prior to the Closing Date shall have been performed; and

(iii)    the delivery by such Purchaser of the items set forth in Section 2.2(b) of this Agreement.

(b) The respective obligations of the Purchasers hereunder in connection with the Closing are subject to the following conditions being met:

---

[1] The Company will effect a one-for-four reverse stock split as of April 15, 2007. The Conversion Price of $6.73 (as defined in the Certificate of Designation) was determined on a post-split basis.

[2] The Company will effect a one-for-four reverse stock split as of April 15, 2007. The exercise price for the Warrants was determined on a post-split basis.

(i)     the accuracy in all material respects when made and on the Closing Date of the representations and warranties of the Company contained herein;

(ii)     all obligations, covenants and agreements of the Company required to be performed at or prior to the Closing Date shall have been performed;

(iii)     the delivery by the Company of the items set forth in Section 2.2(a) of this Agreement;

(iv)     there shall have been no Material Adverse Effect with respect to the Company since the date hereof; and

(v)     from the date hereof to the Closing Date, trading in the Common Stock shall not have been suspended by the Commission or the Company's principal Trading Market (except for any suspension of trading of limited duration agreed to by the Company, which suspension shall be terminated prior to the Closing), and, at any time prior to the Closing Date, trading in securities generally as reported by Bloomberg L.P. shall not have been suspended or limited, or minimum prices shall not have been established on securities whose trades are reported by such service, or on any Trading Market, nor shall a banking moratorium have been declared either by the United States or New York State authorities nor shall there have occurred any material outbreak or escalation of hostilities or other national or international calamity of such magnitude in its effect on, or any material adverse change in, any financial market which, in each case, in the reasonable judgment of each Purchaser, makes it impracticable or inadvisable to purchase the Preferred Stock at the Closing.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

3.1     <u>Representations and Warranties of the Company</u>.    Except as set forth in the Prospectus or the Prospectus Supplement, which Prospectus and Prospectus Supplement shall be deemed a part hereof and to qualify any representation or warranty otherwise made herein to the extent of such disclosure, the Company hereby makes the representations and warranties set forth below to each Purchaser:

(a)     <u>Subsidiaries</u>.    All of the direct and indirect subsidiaries (each, a "<u>Subsidiary</u>") of the Company are set forth on the Company's most recently filed Form 10-K. The Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary free and clear of any Liens, and all the issued and outstanding shares of capital stock of each Subsidiary are validly issued and are fully paid, non-assessable and free of preemptive and similar rights to subscribe for or purchase securities.

(b)     <u>Organization and Qualification</u>.    The Company and each of the Subsidiaries is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization (as applicable), with the requisite power and authority to own and use its properties and

assets and to carry on its business as currently conducted. Neither the Company nor any Subsidiary is in violation or default of any of the provisions of its respective certificate or articles of incorporation, bylaws or other organizational or charter documents. Each of the Company and the Subsidiaries is duly qualified to conduct business and is in good standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, could not have or reasonably be expected to result in (i) a material adverse effect on the legality, validity or enforceability of any Transaction Document, (ii) a material adverse effect on the results of operations, assets, business or condition (financial or otherwise) of the Company and the Subsidiaries, taken as a whole, or (iii) a material adverse effect on the Company's ability to perform in any material respect on a timely basis its obligations under any Transaction Document (any of (i), (ii) or (iii), a "Material Adverse Effect") and no Proceeding has been instituted in any such jurisdiction revoking, limiting or curtailing or seeking to revoke, limit or curtail such power and authority or qualification.

(c) Authorization; Enforcement. The Company has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by each of the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder. The execution and delivery of each of the Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of the Company and no further action is required by the Company, its board of directors or its stockholders in connection therewith other than in connection with the Required Approvals. Each Transaction Document has been (or upon delivery will have been) duly executed by the Company and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(d) No Conflicts. The execution, delivery and performance of the Transaction Documents by the Company, the issuance and sale of the Securities and the consummation by the Company of the other transactions contemplated hereby and thereby do not and will not (i) conflict with or violate any provision of the Company's or any Subsidiary's certificate or articles of incorporation, bylaws or other organizational or charter documents, or (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of the Company or any Subsidiary, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing a Company or Subsidiary debt or otherwise) or other understanding to which the Company or any Subsidiary is a party or by which any property or asset of the Company or any Subsidiary is bound or affected or (iii) subject to the Required Approvals, conflict with or result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental

authority to which the Company or a Subsidiary is subject (including federal and state securities laws and regulations), or by which any property or asset of the Company or a Subsidiary is bound or affected, except in the case of each of clauses (ii) and (iii), such as could not have or reasonably be expected to result in a Material Adverse Effect.

(e) <u>Filings, Consents and Approvals</u>. The Company is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person or other entity of any kind, including, without limitation, any Trading Market, in connection with the execution, delivery and performance by the Company of the Transaction Documents, other than any filings required to be made under applicable federal and state securities laws (collectively, the "<u>Required Approvals</u>").

(f) <u>Issuance of the Securities</u>. The Preferred Stock and the Warrants are duly authorized and, when issued and paid for in accordance with the applicable Transaction Documents, will be duly and validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company. The Warrant Shares, when issued in accordance with the terms of the Warrants, will be validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company. The Company has reserved from its duly authorized capital stock the shares of Common Stock issuable upon conversion of the Preferred Stock and exercise of the Warrants. The Securities (other than the Warrant Shares) are being issued pursuant to the Registration Statement and the issuance of the Securities (other than the Warrant Shares) has been registered by the Company under the Securities Act. The Registration Statement is effective and available for the issuance of the Securities (other than the Warrant Shares) thereunder and the Company has not received any notice that the Commission has issued or intends to issue a stop-order with respect to the Registration Statement or that the Commission otherwise has suspended or withdrawn the effectiveness of the Registration Statement, either temporarily or permanently, or intends or has threatened in writing to do so. The "Plan of Distribution" section under the Registration Statement permits the issuance of the Securities hereunder. Upon receipt of the Preferred Stock and the Warrants and, upon respective conversion of the Preferred Stock and exercise of the Warrants, the Underlying Shares and the Warrant Shares, the Purchasers will have good and marketable title to such Securities and the Underlying Shares and Warrant Shares (subject to subsequent registration under the Securities Act) will be freely tradable on the Trading Market.

(g) <u>Capitalization</u>. The capitalization of the Company is substantially as set forth in, or as incorporated by reference into, the Registration Statement. Except as set forth in the SEC Reports, the Company has not issued any capital stock since its most recently filed periodic report under the Exchange Act, other than pursuant to the exercise of employee stock options under the Company's stock option plans, the issuance of shares of Common Stock to employees pursuant to the Company's employee stock purchase plan and pursuant to the conversion or exercise of Common Stock Equivalents outstanding as of the date of the most recently filed periodic report under the Exchange Act. No Person has any right of first refusal, preemptive right, right of participation or any similar right to participate in the transactions contemplated by the Transaction Documents. Except as a result of the purchase and sale of the Securities, there are no

8

outstanding options, warrants, scrip rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exercisable or exchangeable for, or giving any Person any right to subscribe for or acquire, any shares of Common Stock, or contracts, commitments, understandings or arrangements by which the Company or any Subsidiary is or may become bound to issue additional shares of Common Stock or Common Stock Equivalents. The issuance and sale of the Securities will not obligate the Company to issue shares of Common Stock or other securities to any Person (other than the Purchasers) and will not result in a right of any holder of Company securities to adjust the exercise, conversion, exchange or reset price under any of such securities. All of the outstanding shares of capital stock of the Company are validly issued, fully paid and nonassessable, have been issued in compliance with all federal and state securities laws, and none of such outstanding shares was issued in violation of any preemptive rights or similar rights to subscribe for or purchase securities. No further approval or authorization of any stockholder, the Board of Directors of the Company or others is required for the issuance and sale of the Securities. There are no stockholders agreements, voting agreements or other similar agreements with respect to the Company's capital stock to which the Company is a party or, to the knowledge of the Company, between or among any of the Company's stockholders.

(h) <u>SEC Reports; Financial Statements</u>. The Company has complied in all material respects with requirements to file all reports, schedules, forms, statements and other documents required to be filed by it under the Securities Act and the Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, for the two years preceding the date hereof (the foregoing materials, including the exhibits thereto and documents incorporated by reference therein being collectively referred to herein as the "<u>SEC Reports</u>") on a timely basis or has received a valid extension of such time of filing and has filed any such SEC Reports prior to the expiration of any such extension. As of their respective dates, the SEC Reports complied in all material respects with the requirements of the Securities Act and the Exchange Act and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with United States generally accepted accounting principles ("<u>GAAP</u>") applied on a consistent basis during the periods involved, except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of the Company and its consolidated subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments.

(i) <u>Material Changes; Undisclosed Events, Liabilities or Developments</u>. Since the date of the latest audited financial statements included within the SEC Reports, except

as specifically disclosed in the SEC Reports or the Prospectus Supplement, (i) there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect, (ii) the Company has not incurred any liabilities (contingent or otherwise) other than (A) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice and (B) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP or required to be disclosed in filings made with the Commission, (iii) the Company has not altered its method of accounting, (iv) the Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock and (v) the Company has not issued any equity securities to any officer, director or Affiliate, except pursuant to existing Company stock option plans.  The Company does not have pending before the Commission any request for confidential treatment of information.  Except for the issuance of the Securities contemplated by this Agreement or as set forth in the Prospectus Supplement, no event, liability or development has occurred or exists with respect to the Company or its Subsidiaries or their respective business, properties, operations or financial condition, that would be required to be disclosed by the Company under applicable securities laws at the time this representation is made that has not been publicly disclosed at least 1 Business Day prior to the date that this representation is made.

(j) <u>Litigation</u>.    Except as disclosed in the Registration Statement or the Prospectus Supplement, there is no Proceeding pending or, to the knowledge of the Company, threatened against or affecting the Company, any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "<u>Action</u>") which (i) adversely affects or challenges the legality, validity or enforceability of any of the Transaction Documents or the Securities or (ii) could, if there were an unfavorable decision, reasonably be expected to result in a Material Adverse Effect. Except as disclosed in the Registration Statement or the Prospectus Supplement, neither the Company nor any Subsidiary, nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty.  There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the Commission involving the Company or any current or former director or officer of the Company.  The Commission has not issued any stop order or other order suspending the effectiveness of any registration statement filed by the Company or any Subsidiary under the Exchange Act or the Securities Act.

(k) <u>Labor Relations</u>.  No material labor dispute exists or, to the knowledge of the Company, is imminent with respect to any of the employees of the Company which could reasonably be expected to result in a Material Adverse Effect.  The Company and its Subsidiaries believe that their relationships with their employees are good.  No executive officer, to the knowledge of the Company, is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement, or any other contract or agreement or any restrictive covenant, and the continued employment of each such executive officer

10

does not subject the Company or any of its Subsidiaries to any liability with respect to any of the foregoing matters. The Company and its Subsidiaries are in compliance with all U.S. federal, state, local and foreign laws and regulations relating to employment and employment practices, terms and conditions of employment and wages and hours, except where the failure to be in compliance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(l) <u>Compliance</u>. Neither the Company nor any Subsidiary (i) is in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by the Company or any Subsidiary under), nor has the Company or any Subsidiary received notice of a claim that it is in default under or that it is in violation of, any indenture, loan or credit agreement or any other agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (ii) is in violation of any order of any court, arbitrator or governmental body, or (iii) is or has been in violation of any statute, rule or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws applicable to its business and all such laws that affect the environment, except in each case as could not reasonably be expected to have a Material Adverse Effect.

(m)<u>Regulatory Permits</u>.  The Company and the Subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct their respective businesses as described in the SEC Reports, except where the failure to possess such permits could not have or reasonably be expected to result in a Material Adverse Effect ("<u>Material Permits</u>"), and neither the Company nor any Subsidiary has received any notice of proceedings relating to the revocation or modification of any Material Permit.

(n) <u>Title to Assets</u>. The Company and the Subsidiaries have good and marketable title in fee simple to all real property owned by them that is material to the business of the Company and the Subsidiaries and good and marketable title in all personal property owned by them that is material to the business of the Company and the Subsidiaries, in each case free and clear of all Liens, except for Liens as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Company and the Subsidiaries and Liens for the payment of federal, state or other taxes, the payment of which is neither delinquent nor subject to penalties. Any real property and facilities held under lease by the Company and the Subsidiaries are held by them under valid, subsisting and enforceable leases with which the Company and the Subsidiaries are in compliance.

(o) <u>Patents and Trademarks</u>. The Company and the Subsidiaries have, or have rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, trade secrets, inventions, copyrights, licenses and other similar intellectual property rights currently employed by them in connection with the business currently operated by them that are necessary for use in the conduct of their respective businesses as described in the SEC Reports, except where the failure to so have could not reasonably be expected to have a Material Adverse Effect (collectively, the "<u>Intellectual</u>

Property Rights"). Neither the Company nor any Subsidiary has received any written notice that the Intellectual Property Rights used by the Company or any Subsidiary violates or infringes upon the rights of any Person.

(p) Insurance. The Company and the Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which the Company and the Subsidiaries are engaged, including, but not limited to, directors and officers insurance coverage. To the best knowledge of the Company, such insurance contracts are accurate and complete. Neither the Company nor any Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business without a significant increase in cost.

(q) Transactions With Affiliates and Employees. Except as set forth in the SEC Reports, none of the officers or directors of the Company and, to the knowledge of the Company, none of the employees of the Company is presently a party to any transaction with the Company or any Subsidiary (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, other than for (i) payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including restricted stock programs and stock option agreements under any stock option plan of the Company.

(r) Sarbanes-Oxley. The Company is in material compliance with all provisions of the Sarbanes-Oxley Act of 2002 which are applicable to it as of the date hereof and of the Closing Date.

(s) Certain Fees. Except as set forth in the Prospectus Supplement, no brokerage or finder's fees or commissions are or will be payable by the Company to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by the Transaction Documents.

(t) Investment Company. The Company is not, and immediately after receipt of payment for the Securities will not be, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(u) Registration Rights. No Person has any right to cause the Company to effect the registration under the Securities Act of any securities of the Company, which rights are currently not satisfied.

(v) Listing and Maintenance Requirements. The Company's Common Stock is registered pursuant to Section 12(b) or 12(g) of the Exchange Act, and the Company has

taken no action designed to, or which to its knowledge is likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act nor has the Company received any notification that the Commission is contemplating terminating such registration. The Company has not, in the 12 months preceding the date hereof, received notice from any Trading Market on which the Common Stock is or has been listed or quoted to the effect that the Company is not in compliance with the listing or maintenance requirements of such Trading Market. The Company is, and has no reason to believe that it will not in the foreseeable future continue to be, in compliance with all such listing and maintenance requirements.

(w)     Application of Takeover Protections.     The Company and its Board of Directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Company's Certificate of Incorporation (or similar charter documents) or the laws of its state of incorporation that is or could become applicable to the Purchasers as a result of the Purchasers and the Company fulfilling their obligations or exercising their rights under the Transaction Documents, including without limitation as a result of the Company's issuance of the Securities and the Purchasers' ownership of the Securities.

(x) Trading Market Rules.  The issuance and sale of the Securities hereunder does not contravene the rules and regulations of the Trading Market.

(y) Solvency.  Based on the financial condition of the Company as of the Closing Date after giving effect to the receipt by the Company of the proceeds from the sale of the Securities hereunder, during the next 12 months, the Company's assets do not constitute unreasonably small capital to carry on its business as now conducted and as proposed to be conducted including its capital needs taking into account the particular capital requirements of the business conducted by the Company, and projected capital requirements and capital availability thereof.  The Company has no knowledge of any facts or circumstances which lead it to believe that it will file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within one year from the Closing Date.  The SEC Reports set forth as of the dates thereof all outstanding secured and unsecured Indebtedness of the Company or any Subsidiary, or for which the Company or any Subsidiary has commitments.  Neither the Company nor any Subsidiary is in default with respect to any Indebtedness.

(z) Tax Status.  Except for matters that could not, individually or in the aggregate, have or reasonably be expected to result in a Material Adverse Effect, the Company and each Subsidiary has filed all necessary federal, state and foreign income and franchise tax returns and has paid or accrued all taxes shown as due thereon, and the Company has no knowledge of a tax deficiency which has been asserted or threatened against the Company or any Subsidiary.

(aa)     Foreign Corrupt Practices.  Neither the Company, nor to the knowledge of the Company, any agent or other person acting on behalf of the Company, has (i) directly or indirectly, used any funds for unlawful contributions, gifts, entertainment or other

unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company (or made by any person acting on its behalf of which the Company is aware) which is in violation of law, or (iv) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.

(bb)    <u>Accountants</u>.  To the knowledge of the Company, Stonefield Josephson, Inc. (i) is a registered public accounting firm as required by the Exchange Act and (ii) shall express its opinion with respect to the financial statements to be included in the Company's Annual Report on Form 10-K for the year ending December 31, 2007.

(cc)    <u>Acknowledgment Regarding Purchasers' Purchase of Securities</u>.   The Company acknowledges and agrees that each of the Purchasers is acting solely in the capacity of an arm's length purchaser with respect to the Transaction Documents and the transactions contemplated thereby.   The Company further acknowledges that no Purchaser is acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated thereby and any advice given by any Purchaser or any of their respective representatives or agents in connection with the Transaction Documents and the transactions contemplated thereby is merely incidental to the Purchasers' purchase of the Securities. The Company further represents to each Purchaser that the Company's decision to enter into this Agreement and the other Transaction Documents has been based solely on the independent evaluation of the transactions contemplated hereby by the Company and its representatives.

(dd)    <u>Acknowledgement Regarding Purchasers' Trading Activity</u>.   Anything in this Agreement or elsewhere herein to the contrary notwithstanding (except for Sections 3.2(e) and 4.9 hereof), it is understood and acknowledged by the Company (i) that none of the Purchasers have been asked to agree, nor has any Purchaser agreed, to desist from purchasing or selling, long and/or short, securities of the Company, or "derivative" securities based on securities issued by the Company or to hold the Securities for any specified term; (ii) that past or future open market or other transactions by any Purchaser, including Short Sales, and specifically including, without limitation, Short Sales or "derivative" transactions, before or after the closing of this or future transactions, may negatively impact the market price of the Company's publicly-traded securities; (iii) that any Purchaser, and counter-parties in "derivative" transactions to which any such Purchaser is a party, directly or indirectly, presently may have a "short" position in the Common Stock, and (iv) that each Purchaser shall not be deemed to have any affiliation with or control over any arm's length counter-party in any "derivative" transaction. The Company further understands and acknowledges that (a) one or more Purchasers may engage in hedging activities at various times during the period that the Securities are outstanding, including, without limitation, during the periods that the value of the Warrant Shares deliverable with respect to the exercise of the Warrant are being determined and (b) such hedging activities (if any) could reduce the value of the existing stockholders' equity interests in the Company at and after the time that the hedging

14

activities are being conducted. The Company acknowledges that such aforementioned hedging activities do not constitute a breach of any of the Transaction Documents.

(ee)   Regulation M Compliance. The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or, paid any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company, other than, in the case of clauses (ii) and (iii), compensation paid to the Company's placement agent in connection with the placement of the Securities.

3.2   Representations and Warranties of the Purchasers. Each Purchaser, for itself and for no other Purchaser, hereby represents and warrants as of the date hereof and as of the Closing Date to the Company as follows:

(a) Organization; Authority. Such Purchaser is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with full right, corporate or partnership power and authority to enter into and to consummate the transactions contemplated by the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder. The execution, delivery and performance by such Purchaser of the transactions contemplated by this Agreement have been duly authorized by all necessary corporate or similar action on the part of such Purchaser. Each Transaction Document to which it is a party has been duly executed by such Purchaser, and when delivered by such Purchaser in accordance with the terms hereof, will constitute the valid and legally binding obligation of such Purchaser, enforceable against it in accordance with its terms, except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(b) Own Account. Such Purchaser is acquiring the Securities as principal for its own account and not with a view to or for distributing or reselling such Securities or any part thereof in violation of the Securities Act or any applicable state securities law, has no present intention of distributing any of such Securities in violation of the Securities Act or any applicable state securities law and has no direct or indirect arrangement or understandings with any other Persons to distribute or regarding the distribution of such Securities (this representation and warranty not limiting such Purchaser's right to sell the Securities in compliance with applicable federal and state securities laws) in violation of the Securities Act or any applicable state securities law. Such Purchaser is acquiring the Securities hereunder in the ordinary course of its business.

(c) Purchaser Status. At the time such Purchaser was offered the Securities, it was, and at the date hereof it is, either: (i) an "accredited investor" as defined in Rule

501(a)(1), (a)(2), (a)(3), (a)(7) or (a)(8) under the Securities Act or (ii) a "qualified institutional buyer" as defined in Rule 144A(a) under the Securities Act. Such Purchaser is not required to be registered as a broker-dealer under Section 15 of the Exchange Act.

(d) <u>Experience of Such Purchaser</u>. Such Purchaser, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. Such Purchaser is able to bear the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment. Such Purchaser understands that nothing in the Agreement or any other materials presented to the Purchaser in connection with the purchase and sale of the Securities constitutes legal, tax or investment advice. Such Purchaser acknowledges that it must rely on legal, tax and investment advisors of its own choosing in connection with its purchase of the Securities.

(e) <u>Short Sales and Confidentiality Prior To The Date Hereof</u>. Other than the transactions contemplated hereunder, such Purchaser has not directly or indirectly, nor has any Person acting on behalf of or pursuant to any understanding with such Purchaser, executed any disposition, including Short Sales, in the securities of the Company during the period commencing from the time that such Purchaser first received a term sheet (written or oral) from the Company or any other Person setting forth the material terms of the transactions contemplated hereunder until the date hereof (<u>"Discussion Time"</u>). Notwithstanding the foregoing, in the case of a Purchaser that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Purchaser's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of such Purchaser's assets, the representation set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement. Other than to other Persons party to this Agreement, such Purchaser has maintained the confidentiality of all disclosures made to it in connection with this transaction (including the existence and terms of this transaction).

(f) <u>No Government Review</u>. Such Purchaser understands that no United States federal or state agency or any other government or governmental agency has passed upon or made any recommendation or endorsement of the Securities purchased hereunder.

(g) <u>No Intent to Effect a Change of Control</u>. Such Purchaser has no present intent to effect a "change of control" of the Company as such term is understood under the rules promulgated pursuant to Section 13(d) of the Exchange Act.

ARTICLE IV.
OTHER AGREEMENTS OF THE PARTIES

4.1    <u>Integration</u>. The Company shall not sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in Section 2 of the Securities Act) that would be integrated with the offer or sale of the Securities for purposes of the rules and

regulations of any Trading Market such that it would require shareholder approval prior to the closing of such other transaction unless shareholder approval is obtained before the closing of such subsequent transaction.

      4.2    <u>Securities Laws Disclosure; Publicity</u>. The Company shall (a) by 8:30 a.m. (New York City time) on the Business Day immediately following the date hereof, issue a press release disclosing the material terms of the transactions contemplated hereby, and (b) by 8:30 a.m. (New York City time) on the third Trading Day following the date hereof, file a Current Report on Form 8-K disclosing the material terms of the transactions contemplated hereby and including the Transaction Documents as exhibits thereto. The Company and each Purchaser shall consult with each other in issuing any other press releases with respect to the transactions contemplated hereby, and, except as may be required by law, neither the Company nor any Purchaser shall issue any such press release or otherwise make any such public statement without the prior consent of the Company, with respect to any press release of any Purchaser, or without the prior consent of each Purchaser, with respect to any press release of the Company, which consent shall not unreasonably be withheld or delayed, except if such disclosure is required by law, in which case the disclosing party shall promptly provide the other party with prior notice of such public statement or communication. Notwithstanding the foregoing, the Company shall not publicly disclose the name of any Purchaser, or include the name of any Purchaser in any filing with the Commission or any regulatory agency or Trading Market, without the prior written consent of such Purchaser, except (i) as required by federal securities law in connection with the filing of final Transaction Documents (including signature pages thereto) with the Commission and (ii) to the extent such disclosure is required by law or Trading Market regulations, in which case the Company shall provide the Purchasers with prior notice of such disclosure permitted under this subclause (ii).

      4.3    <u>Non-Public Information</u>. Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, the Company covenants and agrees that neither it nor any other Person acting on its behalf will provide any Purchaser or its agents or counsel with any information that the Company believes constitutes material non-public information, unless prior thereto such Purchaser shall have executed a written agreement regarding the confidentiality and use of such information. The Company understands and confirms that each Purchaser shall be relying on the foregoing representations in effecting transactions in securities of the Company.

      4.4    <u>Use of Proceeds</u>. The use of proceeds shall be as described in the Prospectus Supplement.

      4.5    <u>Indemnification of Purchasers</u>. Subject to the provisions of this Section 4.5, the Company will indemnify and hold each Purchaser and its directors, officers, shareholders, members, partners, employees and agents (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title), each Person who controls such Purchaser (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, shareholders, agents, members, partners or employees (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title) of such controlling persons (each, a "<u>Purchaser Party</u>") harmless from any and all losses, liabilities, obligations,

claims, contingencies, damages, costs and expenses, including all judgments, amounts paid in settlements, court costs and reasonable attorneys' fees and costs of investigation that any such Purchaser Party may suffer or incur as a result of or relating to (a) any breach of any of the representations, warranties, covenants or agreements made by the Company in this Agreement or in the other Transaction Documents or (b) any action instituted against a Purchaser, or any of them or their respective Affiliates, by any stockholder of the Company who is not an Affiliate of such Purchaser, with respect to any of the transactions contemplated by the Transaction Documents (unless such action is based upon a breach of such Purchaser's representations, warranties or covenants under the Transaction Documents or any agreements or understandings such Purchaser may have with any such stockholder or any violations by the Purchaser of state or federal securities laws or any conduct by such Purchaser which constitutes fraud, gross negligence, willful misconduct or malfeasance).  If any action shall be brought against any Purchaser Party in respect of which indemnity may be sought pursuant to this Agreement, such Purchaser Party shall promptly notify the Company in writing, and the Company shall have the right to assume the defense thereof with counsel of its own choosing reasonably acceptable to the Purchaser Party.  Any Purchaser Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Purchaser Party except to the extent that (i) the employment thereof has been specifically authorized by the Company in writing, (ii) the Company has failed after a reasonable period of time to assume such defense and to employ counsel or (iii) in such action there is, in the reasonable opinion of such separate counsel, a material conflict on any material issue between the position of the Company and the position of such Purchaser Party, in which case the Company shall be responsible for the reasonable fees and expenses of no more than one such separate counsel.  The Company will not be liable to any Purchaser Party under this Agreement (i) for any settlement by a Purchaser Party effected without the Company's prior written consent, which shall not be unreasonably withheld or delayed or (ii) to the extent, but only to the extent that a loss, claim, damage or liability is attributable to any Purchaser Party's breach of any of the representations, warranties, covenants or agreements made by such Purchaser Party in this Agreement or in the other Transaction Documents.

4.6    Reservation and Registration of Common Stock.

(a) The Company obtained shareholder approval to increase the number of authorized shares of Common Stock on April 10, 2007 (the "Authorized Share Increase").  The Company shall effect the Authorized Share Increase on April 16, 2007 (the "Increase Effective Date"). As of the Increase Effective Date the Company has reserved and the Company shall continue to reserve and keep available at all times, free of preemptive rights, a sufficient number of shares of Common Stock for the purpose of enabling the Company to issue all of the Underlying Shares issuable pursuant to the Preferred Stock and the Warrants in full.

(b) The Company shall use best efforts to file and pursue to effectiveness a registration statement on Form S-3 registering for resale all of the Warrant Shares no later than the Initial Exercise Date (as defined in the Warrants).

4.7    Listing of Common Stock.  The Company hereby agrees to use commercially reasonable best efforts to maintain the listing of the Common Stock on a Trading Market, and as soon as reasonably practicable following the Closing (but not later than the Closing Date) to list

all of the Underlying Shares and Warrant Shares on such Trading Market. The Company further agrees that if the Company applies to have the Common Stock traded on any other Trading Market, it will include in such application all of the Underlying Shares and Warrant Shares, and will take such other action as is necessary to cause all of the Underlying Shares and Warrant Shares to be listed on such other Trading Market as promptly as possible. The Company will take all action reasonably necessary to continue the listing and trading of its Common Stock on a Trading Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Trading Market.

4.8    Equal Treatment of Purchasers. No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of any of the Transaction Documents unless the same consideration is also offered to all of the parties to the Transaction Documents. For clarification purposes, this provision constitutes a separate right granted to each Purchaser by the Company and negotiated separately by each Purchaser, and is intended for the Company to treat the Purchasers as a class and shall not in any way be construed as the Purchasers acting in concert or as a group with respect to the purchase, disposition or voting of Securities or otherwise.

4.9    Short Sales and Confidentiality After The Date Hereof. Each Purchaser, severally and not jointly with the other Purchasers, covenants that neither it nor any Affiliate acting on its behalf or pursuant to any understanding with it will execute any Short Sales during the period commencing at the Discussion Time and ending at the time that the transactions contemplated by this Agreement are first publicly announced as described in Section 4.2. Each Purchaser, severally and not jointly with the other Purchasers, covenants that until such time as the transactions contemplated by this Agreement are publicly disclosed by the Company as described in Section 4.2, such Purchaser will maintain the confidentiality of all disclosures made to it in connection with this transaction (including the existence and terms of this transaction). Notwithstanding the foregoing, no Purchaser makes any representation, warranty or covenant hereby that it will not engage in Short Sales in the securities of the Company after the time that the transactions contemplated by this Agreement are first publicly announced as described in Section 4.2. Notwithstanding the foregoing, in the case of a Purchaser that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Purchaser's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of such Purchaser's assets, the covenant set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement.

4.10    Delivery of Securities After Closing. The Company shall deliver, or cause to be delivered, the respective Securities purchased by each Purchaser to such Purchaser within 3 Business Days of the Closing Date.

4.11    Effectiveness of Registration Statement. Until the date that is 60 calendar days after the expiration of the Warrants (but not earlier than 2 years from the Closing Date), the Company shall maintain the effectiveness of a registration statement to permit the Company to issue the Underlying Shares and the Warrant Shares or else to permit the Purchasers to resell the Securities.

ARTICLE V.
MISCELLANEOUS

5.1     Termination.  This Agreement may be terminated by any Purchaser, as to such Purchaser's obligations hereunder only and without any effect whatsoever on the obligations between the Company and the other Purchasers, by written notice to the other parties, if the Closing has not been consummated on or before April 18, 2007; provided, however, that no such termination will affect the right of any party to sue for any breach by the other party (or parties).

5.2     Fees and Expenses.  Except as expressly set forth in the Transaction Documents to the contrary, each party shall pay the fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement.  The Company shall pay all transfer agent fees, stamp taxes and other taxes and duties levied in connection with the delivery of any Securities to the Purchasers.

5.3     Entire Agreement.  The Transaction Documents, together with the exhibits and schedules thereto, the Prospectus and the Prospectus Supplement, contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.

5.4     Notices.  Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (a) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on a Trading Day, (b) the next Trading Day after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (c) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service, or (d) upon actual receipt by the party to whom such notice is required to be given.  The address for such notices and communications shall be as set forth on the signature pages attached hereto.

5.5     Amendments; Waivers.  No provision of this Agreement may be waived or amended except in a written instrument signed, in the case of an amendment, by the Company and each Purchaser or, in the case of a waiver, by the party against whom enforcement of any such waived provision is sought.  No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right.

5.6     Headings.  The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

5.7     <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns.  The Company may not assign this Agreement or any rights or obligations hereunder without the prior written consent of each Purchaser (other than by merger).  Any Purchaser may assign any or all of its rights under this Agreement to any Person to whom such Purchaser assigns or transfers any Securities, provided such transferee agrees in writing to be bound, with respect to the transferred Securities, by the provisions of the Transaction Documents that apply to the "Purchasers".

5.8     <u>No Third-Party Beneficiaries</u>.  This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, except as otherwise set forth in Section 4.5.

5.9     <u>Governing Law</u>.  All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof.  Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and any other Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding.  Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.  The parties hereby waive all rights to a trial by jury.  If either party shall commence an action or proceeding to enforce any provisions of the Transaction Documents, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding.

5.10     <u>Survival</u>.  The representations and warranties contained herein shall survive the Closing and the delivery of the Shares and Warrant Shares for a period of two years.

5.11     <u>Execution</u>.  This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart.  In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file,

such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

     5.12   <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

     5.13   <u>Rescission and Withdrawal Right</u>. Notwithstanding anything to the contrary contained in (and without limiting any similar provisions of) any of the other Transaction Documents, whenever any Purchaser exercises a right, election, demand or option under a Transaction Document and the Company does not timely perform its related obligations within the periods therein provided, then such Purchaser may rescind or withdraw, in its sole discretion from time to time upon written notice to the Company, any relevant notice, demand or election in whole or in part without prejudice to its future actions and rights.

     5.14   <u>Replacement of Securities</u>. If any certificate or instrument evidencing any Securities is mutilated, lost, stolen or destroyed, the Company shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof (in the case of mutilation), or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction. The applicant for a new certificate or instrument under such circumstances shall also pay any reasonable third-party costs (including customary indemnity) associated with the issuance of such replacement Securities.

     5.15   <u>Remedies</u>. In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of the Purchasers and the Company will be entitled to specific performance under the Transaction Documents. The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations contained in the Transaction Documents and hereby agrees to waive and not to assert in any action for specific performance of any such obligation the defense that a remedy at law would be adequate.

     5.16   <u>Independent Nature of Purchasers' Obligations and Rights</u>. The obligations of each Purchaser under any Transaction Document are several and not joint with the obligations of any other Purchaser, and no Purchaser shall be responsible in any way for the performance or non-performance of the obligations of any other Purchaser under any Transaction Document. Nothing contained herein or in any other Transaction Document, and no action taken by any Purchaser pursuant thereto, shall be deemed to constitute the Purchasers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Purchasers are in any way acting in concert or as a group with respect to such obligations or the

transactions contemplated by the Transaction Documents. Each Purchaser shall be entitled to independently protect and enforce its rights, including without limitation, the rights arising out of this Agreement or out of the other Transaction Documents, and it shall not be necessary for any other Purchaser to be joined as an additional party in any proceeding for such purpose. Each Purchaser has been represented by its own separate legal counsel in their review and negotiation of the Transaction Documents. For reasons of administrative convenience only, Purchasers and their respective counsel have chosen to communicate with the Company through FWS. FWS does not represent any of the Purchasers but only Rodman & Renshaw, LLC, which has acted as placement agent to the transaction. The Company has elected to provide all Purchasers with the same terms and Transaction Documents for the convenience of the Company and not because it was required or requested to do so by the Purchasers.

   5.17   <u>Liquidated Damages</u>.  The Company's obligations to pay any partial liquidated damages or other amounts owing under the Transaction Documents is a continuing obligation of the Company and shall not terminate until all unpaid partial liquidated damages and other amounts have been paid notwithstanding the fact that the instrument or security pursuant to which such partial liquidated damages or other amounts are due and payable shall have been canceled.

   5.18   <u>Construction</u>. The parties agree that each of them and/or their respective counsel has reviewed and had an opportunity to revise the Transaction Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Transaction Documents or any amendments hereto.

*(Signature Pages Follow)*

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**CELL THERAPEUTICS, INC.**

By: _____
    Name:
    Title:

With a copy to (which shall not constitute notice):

Heller Ehrman LLP
333 Bush Street
San Francisco, CA 94104
Facsimile: (415) 772-6268
Attention: Karen Dempsey, Esq.

Address for Notice:

501 Elliot Avenue West, Suite 400
Seattle, Washington 98119
Facsimile: (206) 272-4302
Attention: _Hillary Trepdhier_

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOR PURCHASER FOLLOWS]

24

[PURCHASER SIGNATURE PAGES TO CTIC SECURITIES PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Purchaser: _TANG CAPITAL PARTNERS, LP_

Signature of Authorized Signatory of Purchaser: _Kevin Tang_

Name of Authorized Signatory: _KEVIN C. TANG_

Title of Authorized Signatory: _MANAGING Director_

Email Address of Purchaser: _kevin@tangcapital.com_

Fax Number of Purchaser: _858-200-3837_

Address for Notice of Purchaser: _4401 EASTGATE MALL_
_SAN DIEGO, CA 92121_

Address for Delivery of Securities for Purchaser (if not same as address for notice):



Subscription Amount: $ _3,000,000_

Shares of Preferred Stock: _3,000_

Warrant Shares: _222,882_

Purchaser elects to remove Section 2(d) of the Warrant (4.9% provision):  [Y]/[N]

Purchaser elects to waive Section 6(c) of Article II.2 of the Certificate of Designations: [Y]/[N]

EIN Number: _68-0517277_

[SIGNATURE PAGES CONTINUE]

25

*Exh. 2*

EX-3.4.2 4 dex342.htm ARTICLES OF AMENDMENT TO THE AMENDED AND RESTATED
ARTICLES

Exhibit 3.4.2

## ARTICLES OF AMENDMENT TO
## AMENDED AND RESTATED ARTICLES OF
## CELL THERAPEUTICS, INC.

## DESIGNATION OF PREFERENCES,
## RIGHTS AND LIMITATIONS
## OF
## SERIES B 3% CONVERTIBLE PREFERRED STOCK

Pursuant to the Washington Business Corporation Act, Chapter 23B.10, the undersigned, officer of Cell Therapeutics, Inc., a Washington corporation (hereinafter called the "Corporation"), does hereby submit for filing these Articles of Amendment:

FIRST: The name of the Corporation is Cell Therapeutics, Inc.

SECOND: This amendment to the Amended and Restated Articles of Incorporation, as amended to date (the "Restated Articles") was adopted by the Board of Directors of the Corporation on April 11, 2007. Shareholder action was not required on this amendment pursuant to Article II.2 of the Restated Articles.

THIRD: A new Section 2(b) of Article II is added to the Restated Articles to add the designations, rights and preferences of a new series of preferred stock as follows, such Section to be effective as of April 16, 2007:

"(b) Series B 3% Convertible Preferred Stock"

## TERMS OF PREFERRED STOCK

Section 1. Definitions. Capitalized terms used and not otherwise defined herein that are defined in the Purchase Agreement shall have the meanings given such terms in the Purchase Agreement. For the purposes hereof, the following terms shall have the following meanings:

"Alternate Consideration" shall have the meaning set forth in Section 7(e).

"Bankruptcy Event" means any of the following events: (a) the Corporation or any Significant Subsidiary (as such term is defined in Rule 1-02(w) of Regulation S-X) thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Corporation or any Significant Subsidiary thereof; (b) there is commenced against the Corporation or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after

1

commencement; (c) the Corporation or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered; (d) the Corporation or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment; (e) the Corporation or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors; (f) the Corporation or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts; or (g) the Corporation or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day except Saturday, Sunday, any day which shall be a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Buy-In" shall have the meaning set forth in Section 6(d)(iii).

"Change of Control Transaction" means the occurrence after the date hereof of any of (i) an acquisition by an individual, legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Corporation, by contract or otherwise) of in excess of 33% of the voting securities of the Corporation (other than by means of conversion or exercise of Series B Preferred Stock and the Warrants issued together with the Series B Preferred Stock), or (ii) the Corporation merges into or consolidates with any other Person, or any Person merges into or consolidates with the Corporation and, after giving effect to such transaction, the shareholders of the Corporation immediately prior to such transaction own less than 66% of the aggregate voting power of the Corporation or the successor entity of such transaction, or (iii) the Corporation sells or transfers all or substantially all of its assets to another Person and the shareholders of the Corporation immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, or (iv) a replacement at one time or within a one year period of more than one-half of the members of the Corporation's board of directors which is not approved by a majority of those individuals who are members of the board of directors on the date hereof (or by those individuals who are serving as members of the board of directors on any date whose nomination to the board of directors was approved by a majority of the members of the board of directors who are members on the date hereof), or (v) the execution by the Corporation of an agreement to which the Corporation is a party or by which it is bound, providing for any of the events set forth in clauses (i) through (iv) herein.

"Closing Date" means April 16, 2007, provided that all conditions precedent to (i) the Purchasers' obligations to pay the Subscription Amount and (ii) the Company's obligations to deliver the Preferred Stock and Warrants have been satisfied or waived on or before such date.

2

"Commission" means the Securities and Exchange Commission.

"Common Stock" means the Corporation's common stock, no par value per share, and stock of any other class of securities into which such securities may hereafter be reclassified or changed into.

"Common Stock Equivalents" means any securities of the Corporation or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

"Conversion Amount" means the sum of the Stated Value at issue.

"Conversion Date" shall have the meaning set forth in Section 6(a).

"Conversion Price" shall have the meaning set forth in Section 6(b).

"Conversion Shares" means, collectively, the shares of Common Stock issuable upon conversion of the shares of Series B Preferred Stock in accordance with the terms hereof.

"Dividend Payment Date" shall have the meaning set forth in Section 3(a).

"Equity Conditions" means, during the period in question, (i) the Corporation shall have duly honored all conversions scheduled to occur or occurring by virtue of one or more Notices of Conversion of the applicable Holder on or prior to the dates so requested or required, if any, (ii) the Corporation shall have paid all liquidated damages and other amounts owing to the applicable Holder in respect of the Series B Preferred Stock, (iii) there is an effective Registration Statement pursuant to which the Company is permitted to issue the Conversion Shares or the Holders are permitted to utilize the prospectus thereunder to resell all of the shares of Common Stock issuable pursuant to the Transaction Documents (and the Corporation believes, in good faith, that such effectiveness will continue uninterrupted for the foreseeable future), (iv) the Common Stock is trading on a Trading Market and all of the shares issuable pursuant to the Transaction Documents are listed for trading on such Trading Market (and the Corporation believes, in good faith, that trading of the Common Stock on a Trading Market will continue uninterrupted for the foreseeable future), (v) there is a sufficient number of authorized, but unissued and otherwise unreserved, shares of Common Stock for the issuance of all of the shares of Common Stock issuable pursuant to the Transaction Documents, (vi) there is no existing Triggering Event or no existing event which, with the passage of time or the giving of notice, would constitute a Triggering

3

Event, (vii) the issuance of the shares in question to the applicable Holder would not violate the limitations set forth in Section 6(c) herein, (viii) there has been no public announcement of a pending or proposed Fundamental Transaction or Change of Control Transaction that has not been consummated and (ix) the applicable Holder is in possession of any information furnished by the Corporation that constitutes, or may constitute, material non-public information.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Forced Conversion Amount" means the sum of (i) 100% of the aggregate Stated Value then outstanding, (ii) accrued but unpaid dividends and (iii) all liquidated damages and other amounts due in respect of the Series B Preferred Stock.

"Forced Conversion Date" shall have the meaning set forth in Section 8(a).

"Forced Conversion Notice" shall have the meaning set forth in Section 8(a).

"Forced Conversion Notice Date" shall have the meaning set forth in Section 8(a).

"Fundamental Transaction" shall have the meaning set forth in Section 7(e).

"Holder" shall have the meaning given such term in Section 2.

"Junior Securities" means the Common Stock and all other Common Stock Equivalents of the Corporation other than those securities which are explicitly senior or pari passu to the Series B Preferred Stock in dividend rights or liquidation preference.

"Liquidation" shall have the meaning set forth in Section 5.

"Notice of Conversion" shall have the meaning set forth in Section 6(a).

"Optional Redemption" shall have the meaning set forth in Section 8(b).

"Optional Redemption Amount" means the sum of (i) 100% of the aggregate Stated Value then outstanding, (ii) accrued but unpaid dividends and (iii) all liquidated damages and other amounts due in respect of the Series B Preferred Stock.

"Optional Redemption Date" shall have the meaning set forth in Section 8(b).

"Optional Redemption Notice" shall have the meaning set forth in Section 8(b).

"Optional Redemption Notice Date" shall have the meaning set forth in Section 8(b).

4

"Original Issue Date" means the date of the first issuance of any shares of the Series B Preferred Stock regardless of the number of transfers of any particular shares of Series B Preferred Stock and regardless of the number of certificates which may be issued to evidence such Series B Preferred Stock, and which shall not be earlier than April 16, 2007.

"Purchase Agreement" means the Securities Purchase Agreement, dated as of the Original Issue Date, to which the Corporation and the original Holders are parties, as amended, modified or supplemented from time to time in accordance with its terms.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Series B Preferred Stock" shall have the meaning set forth in Section 2.

"Share Delivery Date" shall have the meaning set forth in Section 6(d).

"Stated Value" shall have the meaning set forth in Section 2, as the same may be increased pursuant to Section 3.

"Subscription Amount" means, as to each Purchaser, the amount in United States dollars and in immediately available funds to be paid for the Series B Preferred Stock purchased pursuant to the Purchase Agreement as specified below such Purchaser's name on the signature page of the Purchase Agreement and next to the heading "Subscription Amount."

"Subsidiary" shall have the meaning set forth in the Purchase Agreement.

"Threshold Period" shall have the meaning set forth in Section 8(a).

"Trading Day" means a day on which the principal Trading Market is open for business.

"Trading Market" means the following exchanges on which the Common Stock is listed for trading on the date in question: the Nasdaq Capital Market or the Nasdaq Global Market.

"Transaction Documents" shall have the meaning set forth in the Purchase Agreement.

"Triggering Event" shall have the meaning set forth in Section 9(a).

"Triggering Redemption Amount" means, for each share of Series B Preferred Stock, the sum of (i) the greater of (A) 130% of the Stated Value and (B) the product of

(a) the VWAP on the Trading Day immediately preceding the date of the Triggering Event and (b) the Stated Value divided by the then Conversion Price, (ii) all accrued but unpaid dividends thereon and (iii) all liquidated damages and other costs, expenses or amounts due in respect of the Series B Preferred Stock.

"Triggering Redemption Payment Date" shall have the meaning set forth in Section 9(b).

"VWAP" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted for trading as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. (New York City time) to 4:02 p.m. (New York City time)); (b) if the OTC Bulletin Board is not a Trading Market, the volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the OTC Bulletin Board; (c) if the Common Stock is not then quoted for trading on the OTC Bulletin Board and if prices for the Common Stock are then reported in the "Pink Sheets" published by Pink Sheets, LLC (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported; or (d) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Holders and reasonably acceptable to the Corporation, the fees and expenses of which shall be paid by the Corporation.

Section 2. Designation, Amount, Par Value and Rank. The series of preferred stock shall be designated as its Series B 3% Convertible Preferred Stock (the "Series B Preferred Stock") and the number of shares so designated shall be up to 37,200 (which shall not be subject to increase without the written consent of all of the holders of the Series B Preferred Stock (each, a "Holder" and collectively, the "Holders")). Each share of Series B Preferred Stock shall have no par value per share and a stated value equal to $1,000, subject to increase set forth in Section 3 (a) below (the "Stated Value"). The Series B Preferred Stock shall be a Junior Security with respect to the Corporation's Series A 3% Convertible Preferred Stock ("Series A Preferred Stock") with respect to the right to receive dividends, to receive the liquidation preference upon Liquidation or upon redemption of the Series B Preferred Stock at the option of the Holder, such that no amounts shall be payable in respect of the Series B Preferred Stock unless all amounts in respect of any such event (dividend, liquidation or optional redemption) have been paid in full in respect of the Series A Preferred Stock.

Section 3. Dividends.

a) Dividends. Holders shall be entitled to receive, and the Corporation shall pay, cumulative dividends at the rate per share (as a percentage of the Stated Value) of 3% per annum (subject to increase pursuant to Section 9(b) of this Article II.2(b)), payable quarterly on January 1, April 1, July 1 and October 1, beginning on the first such

6

Case 1:08-cv-00017-CM-DCF   Document 1-3   Filed 01/02/2008   Page 8 of 24   Page 7 of 23

date after the Original Issue Date, on each Conversion Date (with respect only to shares of Series B Preferred Stock being converted) and on each Optional Redemption Date (with respect only to Series B Preferred Stock being redeemed) (each such date, a "Dividend Payment Date") (if any Dividend Payment Date is not a Trading Day, the applicable payment shall be due on the next succeeding Trading Day) in cash; provided, however, that if funds are not legally available for the payment of dividends on the Series B Preferred Stock (for clarity, including if such payment cannot be made due to the seniority of the Series A Preferred Stock), such dividends shall accrete to, and increase, the Stated Value. Dividends on the Series B Preferred Stock shall be calculated on the basis of a 360-day year, consisting of twelve 30-day periods, shall accrue daily commencing on the Original Issue Date, and shall be deemed to accrue from such Original Issue Date whether or not earned or declared and whether or not there are profits, surplus or other funds of the Corporation legally available for the payment of dividends. Any dividends that are not paid within three Trading Days following a Dividend Payment Date shall continue to accrue and shall entail a late fee, payable in cash, at the rate of 18% per annum or the lesser rate permitted by applicable law (such late fee shall accrue daily from the Dividend Payment Date through and including the date of payment).

b) So long as any Series B Preferred Stock shall remain outstanding, neither the Corporation nor any Subsidiary thereof shall redeem, purchase or otherwise acquire directly or indirectly any Junior Securities except as expressly permitted by Section 10(b). So long as any Series B Preferred Stock shall remain outstanding, neither the Corporation nor any Subsidiary thereof shall directly or indirectly pay or declare any dividend or make any distribution upon (other than a dividend or distribution described in Section 6 of this Article II.2(b)) or dividends due and paid in the ordinary course on preferred stock of the Corporation at such times when the Corporation is in compliance with its payment and other obligations hereunder), nor shall any distribution be made in respect of, any Junior Securities as long as any dividends due on the Series B Preferred Stock remain unpaid, nor shall any monies be set aside for or applied to the purchase or redemption (through a sinking fund or otherwise) of any Junior Securities or shares pari passu with the Series B Preferred Stock.

Section 4. Voting Rights.

a) Except as otherwise provided herein or as otherwise required by law, each holder of the shares of Series B Preferred Stock shall have the right to the number of votes equal to the number of Conversion Shares then issuable upon conversion of the Series B Preferred Stock held by such Holder in all matters as to which shareholders are required or permitted to vote, and with respect to such vote, such Holder shall have full voting rights and powers equal to the voting rights and powers of the holders of Common Stock, and shall be entitled, notwithstanding any provision in these Articles as amended hereby, to vote, together with the holders of Common Stock as a single class, with respect to any question upon which holders of Common Stock have the right to vote; provided, however, as to any Holder the right to vote such shares shall be limited to the number of shares issuable to such Holder pursuant to Section 6(c)

7

on the record date for such vote. To the extent permitted under RCW Chapter 23B, and in accordance with Article V.1 of these Articles, the Corporation's shareholders may take action by the affirmative vote of a majority of all shareholders of this Corporation entitled to vote on an action. This Section is specifically intended to reduce the voting requirements otherwise prescribed under RCW 23B.010.030, 23B.11.030, 23B.11.035 and 23B.12.020 in accordance with RCW 23B.07.270. Without limiting the generality of the foregoing, and notwithstanding the provisions of RCW 23B.10.040, subsections 1(a), (e) and (f), but subject to the provisions of the Section 4(b) below, the Corporation may take any of the actions described in RCW 23B.10,040, subsections 1(a), (e) and (f) by the affirmative vote of the holders of a majority of the Series A Preferred Stock, Series B Preferred Stock and the Common Stock, voting together as one class, with each holder of Series B Preferred Stock having the number of votes set forth above.

b) Notwithstanding anything to the contrary in Section 4(a) above, as long as any shares of Series B Preferred Stock are outstanding, the Corporation shall not, without the affirmative vote of the Holders of a majority of the then outstanding shares of the Series B Preferred Stock, (a) alter or change adversely the powers, preferences or rights given to the Series B Preferred Stock or alter or amend this Article II.2(b), (b) authorize or create any class of stock ranking as to dividends, redemption or distribution of assets upon a Liquidation (as defined in Section 5 of this Article II.2(b)) senior to or otherwise pari passu with the Series B Preferred Stock, (c) amend its articles of incorporation or other charter documents in any manner that adversely affects any rights of the Holders, (d) increase the number of authorized shares of Series B Preferred Stock, or (e) enter into any agreement with respect to any of the foregoing.

Section 5. Liquidation. Subject only to any prior rights of the Series A Preferred Stock, upon any liquidation, dissolution or winding-up of the Corporation, whether voluntary or involuntary (a "Liquidation"), the Holders shall be entitled to receive out of the assets, whether capital or surplus, of the Corporation an amount equal to the Stated Value, plus any accrued and unpaid dividends thereon and any other fees or liquidated damages owing thereon, for each share of Series B Preferred Stock before any distribution or payment shall be made to the holders of any Junior Securities, and if the assets of the Corporation shall be insufficient to pay in full such amounts, then the entire assets to be distributed to the Holders shall be ratably distributed among the Holders in accordance with the respective amounts that would be payable on such shares if all amounts payable thereon were paid in full. A Fundamental Transaction or Change of Control Transaction shall not be deemed a Liquidation. The Corporation shall mail written notice of any such Liquidation, not less than 45 days prior to the payment date stated therein, to each Holder.

Section 6. Conversion.

a) Conversions at Option of Holder. Each share of Series B Preferred Stock shall be convertible, at any time and from time to time from and after the Original Issue Date at the option of the Holder thereof, into that number of shares of Common Stock (subject to the limitations set forth in Section 6(c)) determined by dividing the Stated Value of such share of Series B Preferred Stock by the Conversion Price. Holders shall

8

effect conversions by providing the Corporation with the form of conversion notice attached hereto as Annex A (a "Notice of Conversion"). Each Notice of Conversion shall specify the number of shares of Series B Preferred Stock to be converted, the number of shares of Series B Preferred Stock owned prior to the conversion at issue, the number of shares of Series B Preferred Stock owned subsequent to the conversion at issue and the date on which such conversion is to be effected, which date may not be prior to the date the applicable Holder delivers by facsimile such Notice of Conversion to the Corporation (such date, the "Conversion Date"). If no Conversion Date is specified in a Notice of Conversion, the Conversion Date shall be the date that such Notice of Conversion to the Corporation is deemed delivered hereunder. The calculations and entries set forth in the Notice of Conversion shall control in the absence of manifest or mathematical error. To effect conversions of shares of Series B Preferred Stock, a Holder shall not be required to surrender the certificate(s) representing such shares of Series B Preferred Stock to the Corporation unless all of the shares of Series B Preferred Stock represented thereby are so converted, in which case such Holder shall deliver the certificate representing such shares of Series B Preferred Stock promptly following the Conversion Date at issue. Shares of Series B Preferred Stock converted into Common Stock or redeemed in accordance with the terms hereof shall be canceled and shall not be reissued.

b) Conversion Price. The conversion price for the Series B Preferred Stock shall equal **$6.73** subject to adjustment herein (the "Conversion Price").

c) Beneficial Ownership Limitation. The Corporation shall not effect any conversion of the Series B Preferred Stock, and a Holder shall not have the right to convert any portion of the Series B Preferred Stock, to the extent that, after giving effect to the conversion set forth on the applicable Notice of Conversion, such Holder (together with such Holder's Affiliates, and any other person or entity acting as a group together with such Holder or any of such Holder's Affiliates) would beneficially own in excess of the Beneficial Ownership Limitation (as defined below). For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by such Holder and its Affiliates shall include the number of shares of Common Stock issuable upon conversion of the Series B Preferred Stock with respect to which such determination is being made, but shall exclude the number of shares of Common Stock which are issuable upon (A) conversion of the remaining, unconverted Stated Value of Series B Preferred Stock beneficially owned by such Holder or any of its Affiliates and (B) exercise or conversion of the unexercised or unconverted portion of any other securities of the Corporation subject to a limitation on conversion or exercise analogous to the limitation contained herein (including the Warrants) beneficially owned by such Holder or any of its Affiliates. Except as set forth in the preceding sentence, for purposes of this Section 6(c), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder. To the extent that the limitation contained in this Section 6(c) applies, the determination of whether the Series B Preferred Stock is convertible (in relation to other securities owned by such Holder together with any Affiliates) and of how many shares of Series B Preferred Stock are convertible shall be in the sole discretion of such Holder, and the submission of a

9

Notice of Conversion shall be deemed to be such Holder's determination of whether the shares of Series B Preferred Stock may be converted (in relation to other securities owned by such Holder together with any Affiliates) and how many shares of the Series B Preferred Stock are convertible, in each case subject to such aggregate percentage limitations. To ensure compliance with this restriction, each Holder will be deemed to represent to the Corporation each time it delivers a Notice of Conversion that such Notice of Conversion has not violated the restrictions set forth in this paragraph and the Corporation shall have no obligation to verify or confirm the accuracy of such determination. In addition, a determination as to any group status as contemplated above shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder. For purposes of this Section 6(c), in determining the number of outstanding shares of Common Stock, a Holder may rely on the number of outstanding shares of Common Stock as stated in the most recent of the following: (A) the Corporation's most recent Form 10-Q or Form 10-K, as the case may be, (B) a more recent public announcement by the Corporation or (C) a more recent notice by the Corporation or the Corporation's transfer agent setting forth the number of shares of Common Stock outstanding. Upon the written or oral request of a Holder, the Corporation shall within two Trading Days confirm orally and in writing to such Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Corporation, including the Series B Preferred Stock, by such Holder or its Affiliates since the date as of which such number of outstanding shares of Common Stock was reported. The "Beneficial Ownership Limitation" shall be 4.99% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock issuable upon conversion of Series B Preferred Stock held by the applicable Holder. The Beneficial Ownership Limitation provisions of this Section 6(c) may be waived by such Holder, at the election of such Holder, upon not less than 61 days' prior notice to the Corporation, to change the Beneficial Ownership Limitation to 9.99% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon conversion of Series B Preferred Stock held by the applicable Holder and the provisions of this Section 6(c) shall continue to apply. Upon such a change by a Holder of the Beneficial Ownership Limitation from such 4.99% limitation to such 9.99% limitation, the Beneficial Ownership Limitation shall not be further waived by such Holder. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 6(c) to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Beneficial Ownership Limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitations contained in this paragraph shall apply to a successor holder of Series B Preferred Stock. **Notwithstanding anything herein to the contrary, this provision shall not apply to any Holder that has elected to waive this provision (A) on its signature page to the Purchase Agreement or (B) in a writing acceptable to the company delivered at or prior to the Closing.**

10

### d) Mechanics of Conversion

i. <u>Delivery of Certificate Upon Conversion</u>. Not later than three Trading Days after each Conversion Date (the "<u>Share Delivery Date</u>"), the Corporation shall deliver, or cause to be delivered, to the converting Holder (A) a certificate or certificates, which shall be free of restrictive legends and trading restrictions, representing the number of shares of Common Stock being acquired upon the conversion of shares of Series B Preferred Stock and (B) a bank check in the amount of accrued and unpaid dividends. The Corporation shall use its best efforts to deliver any certificate or certificates required to be delivered by the Corporation under this Section 6 electronically through the Depository Trust Company or another established clearing corporation performing similar functions. If, in the case of any Notice of Conversion, such certificate or certificates are not delivered to or as directed by the applicable Holder by the seventh Trading Day after the Conversion Date, the applicable Holder shall be entitled to elect to rescind such Conversion Notice by written notice to the Corporation at any time on or before its receipt of such certificate or certificates, in which event the Corporation shall promptly return to such Holder any original Series B Preferred Stock certificate delivered to the Corporation and such Holder shall promptly return any Common Stock certificates representing the shares of Series B Preferred Stock tendered for conversion to the Corporation.

ii. <u>Obligation Absolute; Partial Liquidated Damages</u>. The Corporation's obligation to issue and deliver the Conversion Shares upon conversion of Series B Preferred Stock in accordance with the terms hereof are absolute and unconditional, irrespective of any action or inaction by a Holder to enforce the same, any waiver or consent with respect to any provision hereof, the recovery of any judgment against any Person or any action to enforce the same, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by such Holder or any other Person of any obligation to the Corporation or any violation or alleged violation of law by such Holder or any other person, and irrespective of any other circumstance which might otherwise limit such obligation of the Corporation to such Holder in connection with the issuance of such Conversion Shares; provided, however, that such delivery shall not operate as a waiver by the Corporation of any such action that the Corporation may have against such Holder. In the event a Holder shall elect to convert any or all of the Stated Value of its Series B Preferred Stock, the Corporation may not refuse conversion based on any claim that such Holder or any one associated or affiliated with such Holder has been engaged in any violation of law, agreement or for any other reason, unless an injunction from a court, on notice to Holder, restraining and/or enjoining conversion of all or part of the Series B Preferred Stock of such Holder shall have been sought and obtained. In the absence of such injunction, the Corporation shall issue Conversion Shares and, if applicable, cash, upon a properly noticed conversion. If the Corporation fails to deliver to a Holder such certificate or certificates pursuant to Section 6 (d)(i) on the second Trading

11

Day after the Share Delivery Date applicable to such conversion, the Corporation shall pay to such Holder, in cash, as liquidated damages and not as a penalty, for each $10,000 of Stated Value of Series B Preferred Stock being converted, $50 per Trading Day for each Trading Day after such second Trading Day after the Share Delivery Date until such certificates are delivered. Nothing herein shall limit a Holder's right to pursue actual damages or declare a Triggering Event pursuant to Section 9 for the Corporation's failure to deliver Conversion Shares within the period specified herein and such Holder shall have the right to pursue all remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief. The Exercise of any such rights shall not prohibit a Holder from seeking to enforce damages pursuant to any other Section hereof or under applicable law.

    iii. <u>Compensation for Buy-In on Failure to Timely Deliver Certificates Upon Conversion</u>. If the Corporation fails to deliver to a Holder the applicable certificate or certificates by the second Trading Day following the Share Delivery Date pursuant to Section 6(d)(i), and if after such date such Holder is required by its brokerage firm to purchase (in an open market transaction or otherwise), or the Holder's brokerage firm purchases, shares of Common Stock to deliver in satisfaction of a sale by such Holder of the Conversion Shares which such Holder was entitled to receive upon the conversion relating to such Share Delivery Date (a "<u>Buy-In</u>"), then the Corporation shall (A) pay in cash to such Holder (in addition to any other remedies available to or elected by such Holder) the amount by which (x) such Holder's total purchase price (including any brokerage commissions) for the shares of Common Stock so purchased exceeds (y) the product of (1) the aggregate number of shares of Common Stock that such Holder was entitled to receive from the conversion at issue multiplied by (2) the actual sale price at which the sell order giving rise to such purchase obligation was executed (including any brokerage commissions) and (B) at the option of such Holder, either reissue (if surrendered) the shares of Series B Preferred Stock equal to the number of shares of Series B Preferred Stock submitted for conversion or deliver to such Holder the number of shares of Common Stock that would have been issued if the Corporation had timely complied with its delivery requirements under Section 6(d)(i). For example, if a Holder purchases shares of Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted conversion of shares of Series B Preferred Stock with respect to which the actual sale price (including any brokerage commissions) giving rise to such purchase obligation was a total of $10,000 under clause (A) of the immediately preceding sentence, the Corporation shall be required to pay such Holder $1,000. The Holder shall provide the Corporation written notice indicating the amounts payable to such Holder in respect of the Buy-In and, upon request of the Corporation, evidence of the amount of such loss. Nothing herein shall limit a Holder's right to pursue any other remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Corporation's failure to timely deliver certificates representing shares of Common Stock upon conversion of the shares of Series B Preferred Stock as required pursuant to the terms hereof.

12

Case 1:08-cv-00017-CM-DCF    Document 1-3    Filed 01/02/2008    Page 14 of 34

iv. Reservation of Shares Issuable Upon Conversion. The Corporation covenants that it will at all times reserve and keep available out of its authorized and unissued shares of Common Stock for the sole purpose of issuance upon conversion of the Series B Preferred Stock and payment of dividends on the Series B Preferred Stock, each as herein provided, free from preemptive rights or any other actual contingent purchase rights of Persons other than the Holders of the Series B Preferred Stock, not less than such aggregate number of shares of the Common Stock as shall (subject to the terms and conditions in the Purchase Agreement) be issuable (taking into account the adjustments and restrictions of Section 7) upon the conversion of all outstanding shares of Series B Preferred Stock and payment of dividends hereunder. The Corporation covenants that all shares of Common Stock that shall be so issuable shall, upon issue, be duly authorized, validly issued, fully paid and nonassessable and, if the Conversion Shares Registration Statement is then effective under the Securities Act, shall be registered for public sale in accordance with such Conversion Shares Registration Statement.

v. Fractional Shares. Upon a conversion hereunder, the Corporation shall not be required to issue stock certificates representing fractions of shares of Common Stock, but may if otherwise permitted, make a cash payment in respect of any final fraction of a share based on the VWAP at such time.

vi. Transfer Taxes. The issuance of certificates for shares of the Common Stock on conversion of this Series B Preferred Stock shall be made without charge to any Holder for any documentary stamp or similar taxes that may be payable in respect of the issue or delivery of such certificates, provided that the Corporation shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such certificate upon conversion in a name other than that of the Holders of such shares of Series B Preferred Stock so converted and the Corporation shall not be required to issue or deliver such certificates unless or until the Person or Persons requesting the issuance thereof shall have paid to the Corporation the amount of such tax or shall have established to the satisfaction of the Corporation that such tax has been paid.

Section 7. Certain Adjustments.

a) Stock Dividends and Stock Splits. If the Corporation, at any time while this Series B Preferred Stock is outstanding: (A) pays a stock dividend or otherwise makes a distribution or distributions payable in shares of Common Stock on shares of Common Stock or any other Common Stock Equivalents (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Corporation upon

13

conversion of, or payment of a dividend on, this Series B Preferred Stock); (B) subdivides outstanding shares of Common Stock into a larger number of shares; (C) combines (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares; or (D) issues, in the event of a reclassification of shares of the Common Stock, any shares of capital stock of the Corporation, then the Conversion Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding any treasury shares of the Corporation) outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event. Any adjustment made pursuant to this Section 7(a) shall become effective immediately after the record date for the determination of shareholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision, combination or re-classification.

b) [RESERVED].

c) Subsequent Rights Offerings. If the Corporation, at any time while this Series B Preferred Stock is outstanding, shall issue rights, options or warrants to all holders of Common Stock (and not to Holders) entitling them to subscribe for or purchase shares of Common Stock at a price per share that is lower than the VWAP on the record date referenced below, then the Conversion Price shall be multiplied by a fraction of which the denominator shall be the number of shares of the Common Stock outstanding on the date of issuance of such rights or warrants plus the number of additional shares of Common Stock offered for subscription or purchase, and of which the numerator shall be the number of shares of the Common Stock outstanding on the date of issuance of such rights or warrants plus the number of shares which the aggregate offering price of the total number of shares so offered (assuming delivery to the Corporation in full of all consideration payable upon exercise of such rights, options or warrants) would purchase at such VWAP. Such adjustment shall be made whenever such rights or warrants are issued, and shall become effective immediately after the record date for the determination of shareholders entitled to receive such rights, options or warrants.

d) Pro Rata Distributions. If the Corporation, at any time while this Series B Preferred Stock is outstanding, distributes to all holders of Common Stock (and not to Holders) evidences of its indebtedness or assets (including cash and cash dividends) or rights or warrants to subscribe for or purchase any security (other than Common Stock, which shall be subject to Section 7(c)), then in each such case the Conversion Price shall be adjusted by multiplying such Conversion Price in effect immediately prior to the record date fixed for determination of shareholders entitled to receive such distribution by a fraction of which the denominator shall be the VWAP determined as of the record date mentioned above, and of which the numerator shall be such VWAP on such record date less the then fair market value at such record date of the portion of such assets, evidence of indebtedness or rights or warrants so distributed applicable to one outstanding share of the Common Stock as determined by the Board of Directors of the Corporation in good faith. In either case the adjustments shall be described in a statement delivered to the

14

Holders describing the portion of assets or evidences of indebtedness so distributed or such subscription rights applicable to one share of Common Stock. Such adjustment shall be made whenever any such distribution is made and shall become effective immediately after the record date mentioned above.

e) Fundamental Transaction. If, at any time while this Series B Preferred Stock is outstanding, (A) the Corporation effects any merger or consolidation of the Corporation with or into another Person, (B) the Corporation effects any sale of all or substantially all of its assets in one transaction or a series of related transactions, (C) any tender offer or exchange offer (whether by the Corporation or another Person) is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property, or (D) the Corporation effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (in any such case, a "Fundamental Transaction"), then, upon any subsequent conversion of this Series B Preferred Stock, the Holders shall have the right to receive, for each Conversion Share that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one share of Common Stock (the "Alternate Consideration"). For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one share of Common Stock in such Fundamental Transaction, and the Corporation shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holders shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Series B Preferred Stock following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to the Corporation or surviving entity in such Fundamental Transaction shall articles of incorporation or an amendment to its articles of incorporation with the same terms and conditions and issue to the Holders new preferred stock consistent with the foregoing provisions and evidencing the Holders' right to convert such preferred stock into Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 7(e) and insuring that this Series B Preferred Stock (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

f) Calculations. All calculations under this Section 7 shall be made to the nearest cent or the nearest 1/100th of a share, as the case may be. For purposes of this Section 7, the number of shares of Common Stock deemed to be issued and outstanding as of a given date shall be the sum of the number of shares of Common Stock (excluding any treasury shares of the Corporation) issued and outstanding.

15

g) Notice to the Holders.

    i. Adjustment to Conversion Price. Whenever the Conversion Price is adjusted pursuant to any provision of this Section 7, the Corporation shall promptly mail to each Holder a notice setting forth the Conversion Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment. If the Company enters into a Variable Rate Transaction, despite the prohibition set forth in the Purchase Agreement, the Company shall be deemed to have issued Common Stock or Common Stock Equivalents at the lowest possible conversion price at which such securities may be converted or exercised.

    ii. Notice to Allow Conversion by Holder. If (A) the Corporation shall declare a dividend (or any other distribution in whatever form) on the Common Stock, (B) the Corporation shall declare a special nonrecurring cash dividend on or a redemption of the Common Stock, (C) the Corporation shall authorize the granting to all holders of the Common Stock of rights or warrants to subscribe for or purchase any shares of capital stock of any class or of any rights, (D) the approval of any shareholders of the Corporation shall be required in connection with any reclassification of the Common Stock, any consolidation or merger to which the Corporation is a party, any sale or transfer of all or substantially all of the assets of the Corporation, of any compulsory share exchange whereby the Common Stock is converted into other securities, cash or property or (E) the Corporation shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Corporation, then, in each case, the Corporation shall cause to be filed at each office or agency maintained for the purpose of conversion of this Series B Preferred Stock, and shall cause to be delivered to each Holder at its last address as it shall appear upon the stock books of the Corporation, at least 20 calendar days prior to the applicable record or effective date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of the Common Stock of record to be entitled to such dividend, distributions, redemption, rights or warrants are to be determined or (y) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close, and the date as of which it is expected that holders of the Common Stock of record shall be entitled to exchange their shares of the Common Stock for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange, provided that the failure to deliver such notice or any defect therein or in the delivery thereof shall not affect the validity of the corporate action required to be specified in such notice. The Holder is entitled to convert the Stated Value of its Series B Preferred Stock (or any part hereof) during the 20-day period commencing on the date of such notice through the effective date of the event triggering such notice.

16

Section 8. Forced Conversion and Optional Redemption.

a) Forced Conversion. Notwithstanding anything herein to the contrary, if after the six month anniversary of the Original Issue Date the VWAP for each of any 20 consecutive Trading Day period ("Threshold Period") exceeds $13.38, subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the Original Issue Date, the Corporation may, within 1 Trading Day after the end of any such Threshold Period, deliver a written notice to all Holders (a "Forced Conversion Notice" and the date such notice is delivered to all Holders, the "Forced Conversion Notice Date") to cause each Holder to convert all or part of such Holder's Series B Preferred Stock (as specified in such Forced Conversion Notice) plus all accrued but unpaid dividends thereon and all liquidated damages and other amounts due in respect of the Series B Preferred Stock pursuant to Section 6, with the "Conversion Date" for purposes of Section 6 deemed to occur on the third Trading Day following the Forced Conversion Notice Date (such third Trading Day, the "Forced Conversion Date"). The Corporation may not deliver a Forced Conversion Notice, and any Forced Conversion Notice delivered by the Corporation shall not be effective, unless all of the Equity Conditions have been met on each Trading Day during the applicable Threshold Period through and including the later of the Forced Conversion Date and the Trading Day after the date that the Conversion Shares issuable pursuant to such forced conversion are actually delivered to the Holders pursuant to the Forced Conversion Notice. Any Forced Conversion Notices shall be applied ratably to all of the Holders based on each Holder's initial purchases of Series B Preferred Stock hereunder, provided that any voluntary conversions by a Holder shall be applied against such Holder's pro rata allocation, thereby decreasing the aggregate amount forcibly converted hereunder if less than all shares of the Series B Preferred Stock are forcibly converted. For purposes of clarification, a Forced Conversion shall be subject to all of the provisions of Section 6, including, without limitation, the provisions requiring payment of liquidated damages and limitations on conversions.

b) Optional Redemption at Election of Holder. Subject to the provisions of this Section 8 and to any prior rights of the Series A Preferred Stock, at any time after the two year anniversary of the Original Issue Date, the Holder may deliver a notice to the Corporation (an "Optional Redemption Notice" and the date such notice is deemed delivered hereunder, the "Optional Redemption Notice Date") requiring the Corporation to redeem some or all of the then outstanding Series B Preferred Stock for cash in an amount equal to the Optional Redemption Amount on the fifth Trading Day following the Optional Redemption Notice Date (such date, the "Optional Redemption Date" and such redemption, the "Optional Redemption"). The Optional Redemption Amount is payable in full on the Optional Redemption Date. If the Corporation fails to pay the Optional Redemption Amount in full on the Optional Redemption Amount on the Optional Redemption Date, the Corporation shall pay interest thereon at a rate equal to the lesser

17

of 18% per annum or the maximum rate permitted by applicable law, accruing daily from the first day following the Optional Redemption Date until such Optional Redemption Amount, plus any interest thereon, is paid in full. The Corporation shall honor all Notices of Conversion tendered from the time of delivery of the Optional Redemption Notice through the date the Optional Redemption Amount is paid in full.

Section 9. Redemption Upon Triggering Events.

a) "Triggering Event" means any one or more of the following events (whatever the reason and whether it shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

i. if the Company fails to provide at all times an effective registration statement that permits the Company to issue the Conversion Shares or which allows the Holder to sell the Conversion Shares pursuant thereto, subject to a grace period of 20 calendar days;

ii. the Corporation shall fail to deliver certificates representing Conversion Shares issuable upon a conversion hereunder that comply with the provisions hereof prior to the fifth Trading Day after such certificates are required to be delivered hereunder, or the Corporation shall provide written notice to any Holder, including by way of public announcement, at any time, of its intention not to comply with requests for conversion of any shares of Series B Preferred Stock in accordance with the terms hereof;

iii. the Corporation shall fail to have available a sufficient number of authorized and unreserved shares of Common Stock to issue to such Holder upon a conversion hereunder;

iv. unless specifically addressed elsewhere in this these articles of incorporation as a Triggering Event, the Corporation shall fail to observe or perform any other covenant, agreement or warranty contained in, or otherwise commit any breach of the Transaction Documents, and such failure or breach shall not, if subject to the possibility of a cure by the Corporation, have been cured within 30 calendar days after the date on which written notice of such failure or breach shall have been delivered;

v. the Corporation shall be party to a Change of Control Transaction;

vi. there shall have occurred a Bankruptcy Event;

vii. the Common Stock shall fail to be listed or quoted for trading on a Trading Market for more than five Trading Days, which need not be consecutive Trading Days; or

18

viii. any monetary judgment, writ or similar final process shall be entered or filed against the Corporation, any Subsidiary or any of their respective property or other assets for greater than $50,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of 45 calendar days.

b) Upon the occurrence of a Triggering Event, each Holder shall (in addition to all other rights it may have hereunder or under applicable law) have the right, exercisable at the sole option of such Holder, to require the Corporation to redeem all of the Series B Preferred Stock then held by such Holder for a redemption price equal to the Triggering Redemption Amount. The Triggering Redemption Amount shall be due and payable within five Trading Days of the date on which the notice for the payment therefor is provided by a Holder (the "Triggering Redemption Payment Date"). If the Corporation fails to pay in full the Triggering Redemption Amount hereunder on the date such amount is due in accordance with this Section, the Corporation will pay interest thereon at a rate equal to the lesser of 18% per annum or the maximum rate permitted by applicable law, accruing daily from such date until the Triggering Redemption Amount, plus all such interest thereon, is paid in full. For purposes of this Section, a share of Series B Preferred Stock is outstanding until such date as the applicable Holder has been paid the Triggering Redemption Amount in cash.

Section 10. Negative Covenants. So long as any shares of Series B Preferred Stock are outstanding, unless the holders of at least 67% in Stated Value of the then outstanding shares of Series B Preferred Stock shall have otherwise given prior written consent, the Corporation shall not, and shall not permit any of its subsidiaries (whether or not a Subsidiary on the Original Issue Date) to, directly or indirectly:

a) amend these articles of incorporation, its bylaws or other charter documents so as to materially and adversely affect any rights of any Holder;

b) repay, repurchase or offer to repay, repurchase or otherwise acquire any shares of its Common Stock, Common Stock Equivalents or Junior Securities, except for the Conversion Shares to the extent permitted or required under the Transaction Documents or as otherwise permitted by the Transaction Documents; provided, however, that this restriction shall not apply to the repurchase of up to 1,000,000 shares of Common Stock in any 12 month period (subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the Original Issue Date) from employees, officers, directors, consultants or other persons performing services for this Corporation or any Subsidiary pursuant to agreements approved by a majority of the Board of Directors or under which this Corporation has the option to repurchase such shares at cost or at cost upon the occurrence of certain events, such a termination of employment.

19

c) pay cash dividends or distributions on Junior Securities of the Corporation; or

d) enter into any agreement or understanding with respect to any of the foregoing.

Section 11. Miscellaneous.

a) Notices. Any and all notices or other communications or deliveries to be provided by the Holders hereunder including, without limitation, any Notice of Conversion, shall be in writing and delivered personally, by facsimile, or sent by a nationally recognized overnight courier service, addressed to the Corporation, at the address set forth above, facsimile number (206) 272-4324, Attention: James Bianco or such other facsimile number or address as the Corporation may specify for such purposes by notice to the Holders delivered in accordance with this Section 11. Any and all notices or other communications or deliveries to be provided by the Corporation hereunder shall be in writing and delivered personally, by facsimile, or sent by a nationally recognized overnight courier service addressed to each Holder at the facsimile number or address of such Holder appearing on the books of the Corporation, or if no such facsimile number or address appears on the books of the Corporation, at the principal place of business of the Holders. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number specified in this Section 11 prior to 5:30 p.m. (New York City time) on any date, (ii) the date immediately following the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number specified in this Section 11 between 5:30 p.m. and 11:59 p.m. (New York City time) on any date, (iii) the second Business Day following the date of mailing, if sent by nationally recognized overnight courier service, or (iv) upon actual receipt by the party to whom such notice is required to be given.

b) Absolute Obligation. Except as expressly provided herein, no provision of this Certificate of Designation shall alter or impair the obligation of the Corporation, which is absolute and unconditional, to pay liquidated damages, accrued dividends and accrued interest, as applicable, on the shares of Series B Preferred Stock at the time, place, and rate, and in the coin or currency, herein prescribed.

c) Lost or Mutilated Series B Preferred Stock Certificate. If a Holder's Series B Preferred Stock certificate shall be mutilated, lost, stolen or destroyed, the Corporation shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated certificate, or in lieu of or in substitution for a lost, stolen or destroyed certificate, a new certificate for the shares of Series B Preferred Stock so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such certificate, and of the ownership hereof reasonably satisfactory to the Corporation.

20

d) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Certificate of Designation shall be governed by and construed and enforced in accordance with the internal laws of the State of Washington, without regard to the principles of conflict of laws thereof.

e) <u>Waiver</u>. Any waiver by the Corporation or a Holder of a breach of any provision of this Certificate of Designation shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Certificate of Designation or a waiver by any other Holders. The failure of the Corporation or a Holder to insist upon strict adherence to any term of this Certificate of Designation on one or more occasions shall not be considered a waiver or deprive that party (or any other Holder) of the right thereafter to insist upon strict adherence to that term or any other term of this Certificate of Designation. Any waiver by the Corporation or a Holder must be in writing.

f) <u>Severability</u>. If any provision of this Article II.2(b) is invalid, illegal or unenforceable, the balance of this Article II.2(b) shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law.

g) <u>Next Business Day</u>. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

h) <u>Headings</u>. The headings contained herein are for convenience only, do not constitute a part of this Article II.2(b) and shall not be deemed to limit or affect any of the provisions hereof.

i) <u>Status of Converted or Redeemed Series B Preferred Stock</u>. Shares of Series B Preferred Stock may only be issued pursuant to the Purchase Agreement. If any shares of Series B Preferred Stock shall be converted, redeemed or reacquired by the Corporation, such shares shall resume the status of authorized but unissued shares of preferred stock and shall no longer be designated as Series B 3% Convertible Preferred Stock.

********************

21

## ANNEX A

### NOTICE OF CONVERSION

**(TO BE EXECUTED BY THE REGISTERED HOLDER IN ORDER TO CONVERT SHARES OF SERIES B PREFERRED STOCK)**

The undersigned hereby elects to convert the number of shares of Series B 3% Convertible Preferred Stock indicated below into shares of common stock, no par value per share (the "Common Stock"), of Cell Therapeutics, Inc., a Washington corporation (the "Corporation"), according to the conditions hereof, as of the date written below. If shares of Common Stock are to be issued in the name of a Person other than the undersigned, the undersigned will pay all transfer taxes payable with respect thereto and is delivering herewith such certificates and opinions as may be required by the Corporation in accordance with the Purchase Agreement. No fee will be charged to the Holders for any conversion, except for any such transfer taxes.

Conversion calculations:

Date to Effect Conversion: _____

Number of shares of Preferred Stock owned prior to Conversion: _____

Number of shares of Preferred Stock to be Converted: _____

Stated Value of shares of Preferred Stock to be Converted: _____

Number of shares of Common Stock to be Issued: _____

Applicable Conversion Price: _____

Number of shares of Preferred Stock subsequent to Conversion: _____

[HOLDER]

By: _____
Name:
Title:

*********************

I certify that I am a duly appointed and incumbent officer of the above named Corporation and that I am authorized to execute these Articles of Amendment on behalf of the Corporation.

EXECUTED, this 12th day of April, 2007.

CELL THERAPEUTICS, INC.,
a Washington corporation

/s/ Louis A. Bianco
Name: Louis A. Bianco
Title:  Executive Vice President, Finance and
Administration

Exh. 3

# ACTION BY WRITTEN CONSENT OF THE

# SERIES B 3% CONVERTIBLE PREFERRED SHAREHOLDERS OF

# CELL THERAPEUTICS, INC.

The undersigned shareholders of Cell Therapeutics, Inc., a Washington corporation (the "Company"), who hold at least 67% of the Company's outstanding Series B 3% Convertible Preferred Stock (the "Series B Preferred Stock"), hereby approve the following:

**Clarification and Consent under the Articles of Amendment to Amended and Restated Articles ("Restated Articles")**

**WHEREAS,** the Company currently has outstanding several series of convertible notes which may be deemed to be "Common Stock Equivalents" as defined in the Restated Articles (capitalized terms not otherwise defined herein being used herein as therein defined) and the Company may issue additional convertible notes from time to time;

**WHEREAS,** the Company is seeking to restructure all or a portion of its existing indebtedness which may include the cancellation, exchange or acquisition of such Common Stock Equivalents and/or the issuance of new notes, Junior Securities or other inducements involving Common Stock or Common Stock Equivalents to one or more of the holders of such indebtedness (individually and collectively a "Transaction");

Now therefore, be it

**RESOLVED:**  That any such Transaction is hereby approved.

[Signature Page Follows]

This Action by Written Consent may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument, and shall be effective as of the date upon which shareholders of at least 67% of the of the outstanding Series B Preferred Stock have executed this consent.

Date of Execution:  November __, 2007

**Tang Capital Partners, LP**

By:        _____

Name:      _____

Title:     _____

Exh. 4

FILED
SECRETARY OF STATE
DEC 1 1 2007
STATE OF WASHINGTON

# ARTICLES OF CORRECTION
## TO THE ARTICLES OF AMENDMENT TO
### AMENDED AND RESTATED ARTICLES OF INCORPORATION
### OF CELL THERAPEUTICS, INC.
### FILED IN THE OFFICE OF THE
### SECRETARY OF STATE OF WASHINGTON APRIL 16, 2007

Pursuant to the provisions of RCW 23B.01.240, the following Articles of Correction to the Amended and Restated Articles of Incorporation of Cell Therapeutics, Inc., a Washington Corporation (the "Corporation"), are submitted for filing.

1. The name of the Corporation is Cell Therapeutics, Inc.

2. The Articles of Amendment to Amended and Restated Articles of Incorporation (the "Articles") filed with the Secretary of State of Washington on April 16, 2007 require a correction as permitted by Section 23B.01.240 of the Washington Business Corporation Act.

3. The inaccuracy or defect of the Articles to be corrected is as follows: The ninth paragraph of Article II, Section 2(b), which designates the rights and preferences of the Corporation's Series B 3% Convertible Preferred Stock, of the Articles incorrectly states the definition of "Common Stock Equivalents" to include "debt."

4. The corrected ninth paragraph of Article II, Section 2(b) should read as follows:

""Common Stock Equivalents" means any securities of the Corporation or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including without limitation, any preferred stock, rights, options, warrants, or other instrument that is at any time convertible into or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock; provided, however, that Common Stock Equivalents shall not include any debt securities of the Corporation."

IN WITNESS WHEREOF, the Corporation has caused these Articles of Correction to be executed this _10_th day of December, 2007.

Louis A. Bianco, Executive Vice President,
Finance and Administration
Cell Therapeutics, Inc.

SF 1429344 v1
12/10/07 2:09 PM (26866.0004)

Exh. 5

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 8-K**

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report: (Date of earliest event reported): **December [11], 2007**

**CELL THERAPEUTICS, INC.**
(Exact name of registrant as specified in its charter)

| **Washington** | **001-12465** | **91-1533912** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification Number) |

**501 Elliott Avenue West, Suite 400**
**Seattle, Washington 98119**
(Address of principal executive offices)
**Registrant's telephone number, including area code:  (206) 282-7100**
**Not applicable**
(Former name or former address, if changed since last report).

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Section 1 — Registrant's Business and Operations**

**Item 1.01.    Entry into a Material Definitive Agreement.**

*Exchange Agreements*

On December [11], 2007, Cell Therapeutics, Inc. (the "Corporation") entered into separate agreements (the "Exchange Agreements") with certain holders (the "Holders") of its existing 5.75% Convertible Senior Subordinated Notes and 5.75% Convertible Subordinated Notes due June 15, 2008 (the "Old Notes"), pursuant to which holders of approximately [$42] million in aggregate principal amount of the Old Notes agreed to exchange their Old Notes for approximately [$--] million in aggregate principal amount of a new series of notes, the 5.75% Convertible Senior Notes due [December 15], 2011 (the "New Notes"), plus [___] shares of the Corporation's common stock, no par value (the "Common Shares"). The Corporation issued the New Notes pursuant to the terms of an Indenture, dated December [11], 2007 between the Corporation and U.S. Bank National Association, as trustee (the "Indenture"). On December 12, 2007 the Corporation completed the exchange. After the satisfaction of the closing conditions and the subsequent completion of the exchange, approximately $[  ] million in aggregate principal of the Old Notes remain outstanding.

The Corporation issued the New Notes and the Common Shares to the Holders in a private placement pursuant to the exemption from the registration requirements afforded by Section 4(2) of the Securities Act of 1933, as amended (the "Act"). The Holders are all either "qualified institutional buyers" within the meaning of Rule 144A under the Act or "accredited investors" as defined in Rule 501 of Regulation D promulgated under the Act. The New Notes issued to the Holders include legends restricting transfer other than pursuant to an effective registration statement under the Act or in accordance with an exemption from registration.

In connection with the Exchange Agreements, the Corporation entered into a registration rights agreement with each Holder (each the "Registration Rights Agreement"), pursuant to which the Corporation has agreed to prepare and file a shelf registration statement with the Securities and Exchange Commission covering the resale of the New Notes, the Common Stock issuable upon conversion of the New Notes, and the Common Shares no later than [90] days following the issuance of the New Notes and the Common Shares, and thereafter use its best efforts to cause such registration statement to be declared effective within [180] days of the issuance of the New Notes and the Common Shares. If the Corporation fails to timely file or cause such shelf registration to be declared effective, the Corporation will be required to pay additional interest on the Notes.

The description of the terms and the conditions of the Exchange Agreements set forth herein does not purports to be complete and is qualified in its entirety by reference to the full text of the form of Exchange Agreement, which is attached hereto as Exhibit 10.1 and is incorporated herein by reference.

*Terms of the [5.75]% Convertible Senior Notes due 2011*

The New Notes bear an annual interest rate of [5.75] percent and are initially convertible into shares of the Company's common stock, no par value ("Common Stock") at a rate of [  ] shares per $1,000 principal amount of the notes, which is equivalent to an initial conversion price of $[  ] per share (the "Conversion Price"), as may be automatically adjusted upon occurrence of certain events from time to time. Upon any automatic conversion of the New Notes, if the holders exercise their right to require the Corporation to repurchase the New Notes upon a Change of Control or if the Corporation elects to redeem the New Notes, the Corporation shall be required to pay a premium make-whole amount to the Holders of the New Notes so converted, redeemed or repurchased, equal to $[  ] per $1,000 principal amount of the New Notes so

converted, redeemed or repurchased, less any interest paid on such New Notes prior to the conversion date (a "Make-Whole Payment").

On or after [December 15,2009], the Corporation will have the right to redeem some or all of the New Notes for cash at any time, at a redemption price equal to 100% of the aggregate principal amount of the outstanding New Notes at the time of such redemption plus a Make-Whole Payment and accrued and unpaid interest to, but not including, the redemption date.

The New Notes will automatically convert if, at any time after [December 15, 2009] and prior to maturity, the closing price of the Common Stock has exceeded 140% of the Conversion Price then in effect for at least 20 trading days within any 30 consecutive trading day period, subject to certain conditions. The amount of New Notes that shall automatically convert for any 30 trading day period shall equal the lesser of (i) the value of ten (10) times the volume weighted average price of the Common Stock during such 20 day triggering period times the average daily trading volume of the Common Stock during such 20 day period, rounded down to the nearest $1,000, and (ii) one half of the principal amount of the New Notes that have been authenticated under the Indenture as of the date of the automatic conversion notice. Each 30 trading day period for which an automatic conversion may be triggered shall commence anew at the end of the period which triggered the automatic conversion.

In the event of certain changes in control, holders may require us to repurchase their New Notes at a repurchase price equal to 100% of the aggregate principal amount of such holders' outstanding New Notes at the time of such repurchase, plus a Make-Whole Payment and accrued and unpaid interest to, but not including, the repurchase date. The Corporation will be required to pay 100% of the aggregate principal amount of the New Notes in cash to holders of the New Notes upon such a repurchase.

Interest on the New Notes and any Make-Whole Payments is payable, at the option of the Company, in cash, Common Stock or some combination thereof, subject to certain conditions. If not converted, redeemed or repurchased, the New Notes mature on [December 15, 2011].

An event of default under the indenture will occur on the New Notes if the Company: (i) is delinquent in making certain payments due under the New Notes; (ii) fails to deliver shares of common stock upon conversion of the New Notes; (iii) fails to deliver certain required notices under the New Notes; (iv) fails, following notice, to cure a breach of a covenant under the New Notes, the registration rights agreement, or the indenture (together, the "Transaction Documents"); (v) incurs certain events of default with respect to other indebtedness; (vi) incurs certain events of default with respect to its preferred stock [or makes any payment other than its normally scheduled dividend payments on its preferred stock]; (vii) is subject to certain bankruptcy proceedings or orders; (viii) made any representation or warranty under the Transaction Documents which is materially inaccurate and such representation or warranty continues uncured following notice; or (ix) fails to maintain the listing of the Common Stock on a trading market for more than five trading days. Upon the occurrence of an event of default, the full aggregate principal amount of the New Notes, together with interest and other amounts owing, becomes immediately due and payable. Further, the New Notes shall accrue interest at 12% per annum if an event of default occurs.

The New Notes are senior unsecured obligations of the Corporation and rank *pari passu* in right of payment with all existing and future senior indebtedness of the Corporation, including the Corporation's 6.75% Convertible Senior Notes due 2010 and 7.5% Convertible Senior Notes due 2011, and rank senior in right of payment to the Corporation's currently outstanding 5.75% Convertible Senior Subordinated Notes due

2008, 5.75% Convertible Subordinated Notes due 2008 and 4% Convertible Senior Subordinated Notes due 2010. The Corporation has also agreed to certain restrictions on its incurrence of future indebtedness.

The description of the terms and conditions of the New Notes and the Indenture set forth herein does not purport to be complete and is qualified in its entirety by the full text of the Indenture, which is attached hereto as Exhibit 4.1 and is incorporated herein by reference.

The Corporation knows of no material relationship between the Corporation or its affiliates and the U.S. Bank National Association or the Holders, other than in respect of the Exchange Agreement, the Indenture and the Registration Rights Agreement.

## Section 2 – Financial Information

### Item 2.03.  Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.

The information provided in Item 1.01 of this Current Report on Form 8-K is incorporated herein by reference.

## Section 3 – Securities and Trading Markets

### Item 3.02.  Unregistered Sales of Equity Securities.

The information provided in Item 1.01 of this Current Report on Form 8-K is incorporated herein by reference. The Company issued the New Notes and the Common Shares to the Holders in a private placement pursuant to the exemption from the registration requirements afforded by Section 4(2) of the Act.

## Section 5 – Corporate Governance and Management

### Item 5.03.  Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year

On December 11, 2007, the Company filed three Articles of Correction related to the Series A 3% Convertible Preferred Stock, Series B 3% Convertible Preferred Stock and Series C 3% Convertible Preferred Stock, respectively, copies of which are filed herewith as Exhibit 5.1, Exhibit 5.2 and Exhibit 5.3. The Articles of Correction, which are effective as of December 11, 2007, correct the Disputed Language (as defined below in Item 7.01).

## Section 7 — Regulation FD

### Item 7.01.  Regulation FD Disclosure.

The information provided pursuant to this Item 7.01 shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934 (the "Exchange Act") or incorporated by reference into those filings of the Corporation that provide for the incorporation of all reports and documents filed by the Corporation under the Exchange Act. The information furnished pursuant to this Item 7.01 shall instead be deemed "furnished."

On December [11], 2007 the Corporation issued a press release related to the matters described herein (the "Press Release"). The Press Release is attached hereto as Exhibit 99.1 and is incorporated by reference herein.

The Corporation is also aware that based on language (the "Disputed Language") contained in the Articles of Amendment to the Corporation's Articles of Incorporation (the "Amendments") filed in connection with the issuance of the Corporation's Series A, Series B and Series C Convertible Preferred Stock (the "Preferred Stock"), certain holders thereof (the "Shareholders") have asserted a right to consent (or not) to the transactions contemplated by the Exchange Agreement (the "Exchange"). Attached as Exhibit 99.2 hereof is a letter received from Tang Capital Management, LLC, on December 11, 2007, a holder of the Series B Preferred Stock which alleges such right (the "Letter"). The Corporation is of the view that inclusion of the Disputed Language in the Amendments constitutes a scrivener's error without legal force or effect, and filed Articles of Correction with the Secretary of State of Washington in accordance with Section 23B.01.240 of the Revised Code of Washington as set forth in Item 5.03 above. Although the Corporation disagrees with the statements in the Letter that such consent is required, it is nevertheless possible that the Shareholders will prevail in a claim that they are entitled to have such Preferred Stock be redeemed as if the Exchange were to have caused a Triggering Event based upon such alleged rights or otherwise seek to challenge the validity of the Exchange on the basis thereof.

## Section 9 – Financial Statements and Exhibits

## Item 9.01. Financial Statements and Exhibits.

(d) Exhibits.

The following exhibits are attached with this report on Form 8-K:

| 4.1 | Indenture, dated December [11], 2007 between Cell Therapeutics, Inc. and U.S. Bank National Association, as trustee |
|------|---|
| 4.2 | Form of Registration Rights Agreement, dated December [11], 2007 between Cell Therapeutics, Inc. and certain other party thereto |
| 5.1 | Articles of Correction to the Amended and Restated Articles of Incorporation of the Corporation |
| 5.2 | Articles of Correction to the Articles of Amendment to Amended and Restated Articles of Incorporation of the Corporation |
| 5.3 | Articles of Correction to the Articles of Amendment to Amended and Restated Articles of Incorporation of the Corporation |
| 10.1 | Form of Exchange Agreement, dated December [11], 2007 between Cell Therapeutics, Inc. and certain other party thereto. |
| 99.1 | Press Release dated December [12], 2007 |
| 99.2 | Letter received from Tang Capital Management, LLC dated December 11, 2007 |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CELL THERAPEUTICS, INC.

Date: December [12], 2007

By: _____/s/ Louis A. Bianco_____
Louis A. Bianco
      Executive Vice President, Finance and Administration

**EXHIBIT INDEX**

**Exhibit**
**Number**

| | |
|---|---|
| 4.1 | Indenture, dated December [11], 2007 between Cell Therapeutics, Inc. and U.S. Bank National Association, as trustee |
| 4.2 | Form of Registration Rights Agreement, dated December [11], 2007 between Cell Therapeutics, Inc. and certain other party thereto |
| 5.1 | Articles of Correction to the Amended and Restated Articles of Incorporation of the Corporation |
| 5.2 | Articles of Correction to the Articles of Amendment to Amended and Restated Articles of Incorporation of the Corporation |
| 5.3 | Articles of Correction to the Articles of Amendment to Amended and Restated Articles of Incorporation of the Corporation |
| 10.1 | Form of Exchange Agreement, dated December [11], 2007 between Cell Therapeutics, Inc. and certain other party thereto |
| 99.1 | Press Release dated December [12], 2007 |
| 99.2 | Letter received from Tang Capital Management, LLC dated December 11, 2007 |

EX-99.1 8 dex991.htm PRESS RELEASE

Exhibit 99.1

**Cell Therapeutics, Inc.**
Making cancer more treatable

 **cti.**    501 Elliott Ave. W. #400 T  206.282.7100
Seattle, WA 98119        F  206.272.4010

### Cell Therapeutics, Inc. Announces
### Issuance of $23.25 Million in New Convertible Senior Notes
### in Exchange for $36.08 Million of Existing Convertible Senior
### Subordinated and Subordinated Notes

Exchange retired $12.83 million in existing current 2008 convertible notes and extended the
maturity to 2011 on an additional $23.25 million in 2008 convertible notes

**December 12, 2007 Seattle**—Cell Therapeutics, Inc. ("CTI" or the "Company") (NASDAQ and MTAX: CTIC) today
announced that it issued approximately $23.25 million of its new 5.75% Convertible Senior Notes (the "New Notes") due
2011 and 5,459,574 shares of its common stock, no par value (the "Common Stock") in exchange for approximately $10.5
million of its outstanding 5.75% Convertible Senior Subordinated Notes due 2008 (the "Senior Subordinated Notes") and
approximately $25.6 of its outstanding 5.75% Convertible Subordinated Notes due 2008 (the "Subordinated Notes"). The
New Notes and Common Stock were issued in a private placement exempt from the registration requirements of the
Securities Act of 1933, as amended (the "Securities Act"). Approximately $19.8 million in Senior Subordinated Notes and
Subordinated Notes remain outstanding and mature in June 2008.

The New Notes bear interest at 5.75% per annum and are convertible for shares of CTI common stock at the rate of 333.33
shares per $1,000 principal amount of New Notes, which is equivalent to an initial conversion price of approximately $3.00
per share. The New Notes rank equal in right of payment with all existing and future senior indebtedness of CTI, including
the Corporation's 6.75% Convertible Senior Notes due 2010 and 7.5% Convertible Senior Notes due 2011, and rank senior in
right of payment to the Corporation's currently outstanding Senior Subordinated Notes, Subordinated Notes and 4%
Convertible Senior Subordinated Notes due 2010.

The New Notes and the Common Stock to be issued pursuant to the exchange agreement have not been registered under the
Securities Act or any state securities laws. The New Notes and the Common Stock issued pursuant to the exchange
agreement and the common stock issuable upon conversion of the New Notes may not be offered or sold in the United States
absent registration or an applicable exemption from the registration requirements of the Securities Act and any applicable
state laws.

*-more-*

Page 2 of 2

This announcement is neither an offer to sell nor a solicitation of an offer to buy any of these securities and shall not constitute an offer, solicitation or sale in any jurisdiction in which such offer, solicitation or sale is unlawful.

*This press release includes forward-looking statements that involve a number of risks and uncertainties, the outcome of which could materially and/or adversely affect actual future results. The risks and uncertainties that the company continues to have approximately $19.8 million of convertible notes due in June 2008 as well a significant amount debt outstanding in future years and will need to raise additional capital to fund its operations in 2008 as well as include the risk factors listed or described from time to time in the Company's filings with the Securities and Exchange Commission including, without limitation, the Company's most recent filings on Forms 10-K, 8-K, and 10-Q. Except as may be required by Italian law, CTI does not intend to update or alter its forward-looking statements whether as a result of new information, future events, or otherwise.*

### 

**Media Contact:**

**Cell Therapeutics, Inc.**
Dan Eramian
T: 206.272.4343
C: 206.854.1200
Susan Callahan
T: 206.272.4472
F: 206.272.4434
E: media@ctiseattle.com
www.cticseattle.com/media.htm

**Investors Contact:**

**Cell Therapeutics, Inc.**
Leah Grant
T: 206.282.7100
F: 206.272.4434
E: invest@ctiseattle.com
www.cticseattle.com/investors.htm

EX-99.2 9 dex992.htm LETTERS RECEIVED FROM TANG CAPITAL MANAGEMENT

**Exhibit 99.2**

TANG CAPITAL MANAGEMENT, LLC
4101 EASTGATE MALL, SAN DIEGO, CA 92121
(858) 200-3830 Fax (858) 200-3837

December 11, 2007

Cell Therapeutics, Inc.
Attn: James A. Bianco, M.D.
President and Chief Executive Officer
501 Elliot Avenue West, Suite 400
Seattle, Washington 98119

Re: Acquisition of 2008 Indentures

Dear Dr. Bianco:

As you are aware, Tang Capital Partners holds $3 million (or 19.5%) of the approximately $15.4 million in stated value of the outstanding Series B 3% Convertible Preferred Stock of Cell Therapeutics. Inc. (the *"Company"*). as reported on the Company's Form l0-Q for the period ended September 30, 2007, which was filed with the Securities and Exchange Commission on November 9, 2007. Section 10 of Article II, Section (2)(b) of the Company's Amended and Restated Articles of Incorporation (the *"Articles"*) provides in relevant part that, "So long as any shares of Series B Preferred Stock are outstanding, unless the holders of at least 67% in Stated Value of the then outstanding shares of Series B Preferred Stock shall have otherwise given prior written consent, the Corporation shall not ... directly or indirectly ... repay, repurchase or offer to repay, repurchase or otherwise acquire any shares of its Common Stock, Common Stock Equivalents or Junior Securities ... ." (the *"Negative Covenant"*).

We understand that the Company is seeking to exchange or otherwise restructure its outstanding indentures due in June 2008 (the *"2008 Indentures"*). Any transaction involving the 2008 Indentures that includes an exchange of the 2008 Indentures in whole or in part for other securities or property is either an acquisition or a repurchase, direct or indirect, of the 2008 Indentures and, therefore, requires the prior consent of the holders of the Series B Preferred Stock pursuant to the Negative Covenant. In fact, the Company may be in breach of the Negative Covenant by offering to engage in the restructuring transaction without first obtaining the required consent of the holders of the Series B Preferred Stock. If the Company were to proceed with any such transaction without first obtaining the requisite consent, that would certainly constitute a breach. Any such breach would entitle us and all other holders of the Series B Preferred Stock to require the Company to redeem the Series B Preferred Stock for a redemption price equal to the sum of 130% of the stated value of that stock, all accrued but unpaid dividends thereon and all liquidated damages and other costs, expenses or amounts due in respect of the Series B Preferred Stock, pursuant to Section 9 of Article II. Section (2)(b) of the Articles.

1.

Please confirm in writing at your earliest convenience that the Company has either received the consent required by the Negative Covenant, or will not proceed with any acquisition of the 2008 Indentures without first obtaining such consent.

I look forward to your prompt response.

Sincerely,

**Tang Capital Partners, L.P.**

By: Tang Capital Management. LLC, its general
    partner

By: /s/ Kevin C. Tang
    Kevin C. Tang, Manager

cc: Karen A. Dempsey, HellerEhrman LLP

2.

TANG CAPITAL MANAGEMENT, LLC
4101 EASTGATE MALL, SAN DIEGO, CA 92121
(858) 200-3830 Fax (858) 200-3837

December 12, 2007

Cell Therapeutics, Inc.
Attn: James A. Bianco, M.D.
President and Chief Executive Officer
501 Elliot Avenue West, Suite 400
Seattle, Washington 98119

Re: Acquisition of 2008 Indentures

Dear Dr. Bianco:

I am writing in reference to the e-mail I received last night from Karen A. Dempsey of HellerEhrman LLP that was sent on behalf of Cell Therapeutics, Inc. (the *"Company"*). In yesterday's correspondence, Ms. Dempsey brought it to my attention that the Company has filed in the Office of the Secretary of State of Washington an error in the Company's Articles of Amendment to the Amended and Restated Articles of Incorporation relating to its Series B 3% Convertible Preferred Stock (the *"Series B Preferred"*). As you are aware, the Amended and Restated Articles of Incorporation were incorporated by reference into the prospectus (the *"Series B Prospectus"*) delivered to the investors in connection with the sale of the Series B Preferred.

Under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, the Company is strictly liable to the purchasers of the Series B Preferred for any error in the Series B Prospectus. The Company's admission of an error in the Series B Prospectus gives me great concern.

In light of the foregoing, I strongly suggest that the Company not move forward with the proposed acquisition of the Company's existing 5.75% Convertible Senior Subordinated Notes and 5.75% Convertible Subordinated Notes due June 15, 2008 without first resolving the issues identified both yesterday and above.

Sincerely,

**Tang Capital Partners, L.P.**

By: Tang Capital Management, LLC, its general
    partner

By: /s/ Kevin C. Tang
    Kevin C. Tang, Manager

cc:  Karen A. Dempsey, HellerEhrman LLP